426

Nathan MALCHMAN, Gerta Conway, William Deautriell, and Louis Stone, Plaintiffs-Appellees,

v.

Leonard DAVIS, Sophie Davis, Colonial Penn Group, Inc., Colonial Penn Franklin Insurance Company, Intramerica Life Insurance Company, National Association Plans, Inc., American Association of Retired Persons, National Retired Teachers Association, Carrie B. Allen, Oranda Bangsberg, Bernard Berggren, June Biggar, Arthur Bouton, Olaf Kaasa, Clara L. Kleweno, Floyd E. Tumbleson, J. Leonard Johnson, C.E. Carmichael, American Association of Retired Persons Insurance Trust, Dorothy M. Crippen, James J. Browning, Lloyd I. Singer, Cyril F. Brickfield, and John J. MacWilliams, Defendants-Appellees,

Mountain Plains Congress of Senior Organizations, Mr. and Mrs. Hugh A. Groves, Francis Seely, Estelle Whittle, Henry Whittle, Mr. and Mrs. Burton W. Atkinson, Mr. and Mrs. C.E. Dietrich, Harriet Miller, and Alice Van Landingham, Objectors-Appellants.

No. 888, Docket 82–7759.

United States Court of Appeals, Second Circuit.

Argued Feb. 14, 1983.

Decided May 2, 1983.

Newman, Circuit Judge, concurred with an opinion.

Lumbard, Circuit Judge, filed a statement concurring in the opinions of Oakes and Newman, Circuit Judges.

Joseph A. Yablonski, Washington, D.C. (Daniel B. Edelman, Yablonski, Both & Edelman, Washington, D.C., Philip J. Hirschkop, Hirschkop & Grad, P.C., Alexandria, Va., Robert J. Sugarman, Sugarman & Denworth, Philadelphia, Pa.), for objectors-appellants.

Michael Lesch, New York City (Fran M. Jacobs, Shea & Gould, New York City, Stanley L. Kaufman, Irving Malchman, Kaufman, Malchman & Kirby, New York City, of counsel), for plaintiffs-appellees.

Sidney Rosdeitcher, Washington, D.C. (Jeffrey C. Slade, Paul, Weiss, Rifkind, Wharton & Garrison, Washington, D.C., of counsel), for Colonial Penn Group, Inc., and related defendants-appellees.

Geoffrey M. Kalmus, New York City (Michael S. Oberman, Kramer, Levin, Nessen, Kamin & Soll, New York City, of counsel), for Association defendants-appellees.

Before LUMBARD, OAKES and NEWMAN, Circuit Judges.

OAKES, Circuit Judge:

This appeal is by objectors to the settlement of a class action antitrust suit. The settlement, while giving certain injunctive relief against some of the defendants, also waives any claim for damages for the defendants' past conduct by several million members of the plaintiffs' class(es). Coordinately, the settlement agreement covers a state court lawsuit for breach of fiduciary duty and conflict of interest arising out of the same facts. The settlement awards counsel fees and expenses totaling $2,325,-000 for the two law firms representing the plaintiffs. The settlement was approved by the United States District Court for the Southern District of New York, Thomas P. Griesa, Judge, after a hearing and in an order which stated conclusions but made no specific findings. Our duty to review this important settlement cannot properly be fulfilled because we do not have sufficient analysis of several pivotal issues. We are required to remand this case for further consideration.

## BACKGROUND FACTS

This litigation and the companion state court action, *Conway v. Davis*, No. 10535/76 (N.Y.Sup.Ct., N.Y.Cty.), principally arise from the relationship between Leonard Davis and various corporate entities owned or controlled by him and two nonprofit organizations of elderly persons, the National Retired Teachers Association (NRTA) and

the American Association of Retired Persons (AARP).

Dr. Ethel Percy Andrus, a retired California high school principal, founded the NRTA in 1947 to promote the interests of retired teachers. In 1956, at Dr. Andrus's request, insurance broker Leonard Davis persuaded a national insurance company to underwrite a voluntary group health insurance program for the members of NRTA. In 1958, again with Davis's help, Dr. Andrus formed the AARP to serve the interests of Americans over 55 years old. AARP offered voluntary group health insurance to its members similar to NRTA's. Since their founding, the two associations have attracted millions of members and presently have, between them, over 13 million members throughout the United States. Meanwhile, Davis formed the companies that in time became Colonial Penn Group (CPG) to underwrite health insurance policies in group plans and to provide other services to the associations' members. From 1958 on Davis and his companies managed the AARP and NRTA insurance plans. The associations encouraged their members to purchase insurance, travel and other products and services exclusively through Davis-controlled entities, including insurance subsidiaries, group travel companies, and employment agencies. Davis's entities, moreover, had the exclusive right to advertise in the associations' publications and were permitted to do so at what appears to be substantially less than the fair market value of such advertising. CPG also maintained the membership lists of the associations in its computers.

As AARP and NRTA grew, so did Colonial Penn and its various subsidiaries, its total revenues being $171 million in 1972 and $445 million in 1976. The AARP/NRTA health insurance plans generated over $261 million in premiums in 1977. As of January 1, 1976, CPG led 929 major United States corporations in profitability with a five-year average annual return on capital of 33.5%, a figure nearly double the profitability of either IBM or Xerox and three times greater than the median return of 11.3% for the entire insurance industry.

## THE STATE COURT LITIGATION

*Lederer v. Colonial Penn Group,* the original state court complaint, dated May 4, 1976, was a class action on behalf of insurance-buying members of AARP and alleged principally that the class was overcharged for insurance policies purchased from CPG. The complaint charged the defendants including Davis, CPG, and various people connected with the associations with fraud and breach of fiduciary duty. The complaint sought only injunctive relief and no damages. The action was brought by a firm known as Kaufman, Taylor, Kimmel & Miller (Kaufman-Kimmel). When a motion to dismiss was scheduled for oral argument, Shea & Gould, then known as Shea, Gould, Climenko & Casey, appeared as co-counsel for the plaintiffs and the original complaint was dismissed upon consent with leave to replead.

In July 1977, an amended complaint was served and filed in New York State Supreme Court with Gerta C. Conway as an additional plaintiff. The amended complaint also alleged fraud and breach of fiduciary duties to AARP members who then held group health insurance, approximately 2.5 million persons. Defendants were Davis and his wife, controlling stockholders of CPG, CPG's chairman, AARP, members of its board and trustees of its insurance trust, and AARP's attorneys. Defendants moved to dismiss the amended state complaint.

The defendants took the initiative in the litigation, serving the plaintiffs with interrogatories and requests for production of documents. The defendants vigorously attacked the adequacy of the named plaintiffs as class representatives: each plaintiff was deposed and interrogatories were answered. Though plaintiffs did take a lengthy deposition of Harriet Miller, a former Executive Director of AARP who had filed a separate suit against Leonard Davis and others following her discharge, and thirteen other depositions, the plaintiffs never served interrogatories on any of the defendants or requested admissions from any of them in

the state case. When plaintiffs served defendants with requests for production of documents in July 1978, defendants sought an order preserving confidentiality. As of early 1979, plaintiffs had obtained little or no discovery information from defendants. A stipulation of settlement was entered into on November 3, 1980, covering both the state court and the federal actions. That stipulation will be discussed in further detail below.

## THE FEDERAL LITIGATION

This action, alleging violation of the federal antitrust laws, was filed by both the Shea & Gould and the Kaufman-Kimmel firms in October 1977 on behalf of plaintiffs Lederer, Conway, and Nathan Malchman. This suit was also filed as a class action only on behalf of insurance-buying members of AARP and named essentially the same defendants as did the state court action. Like the state court action it sought injunctive relief and not restitution or money damages. No discovery at all was undertaken by plaintiffs in this action. In September of 1980, CPG and the associations made an agreement including the following provisions: (1) the associations would select a group health insurance carrier commencing July 1, 1981; (2) the associations would accept advertising from companies other than CPG in their publications; (3) the associations would significantly revise their operating procedures thereby granting—indeed, granting—authority to the associations' boards of directors to select and supervise the associations' insurance plans, an assertion of independence in keeping with the associations' unilateral decisions to limit the rights of Honorary Presidents including Leonard Davis and to eliminate the provisions for the continuation of the trustees of the associations' insurance trust in office for life with the right to designate their own successors; (4) CPG would pay the associations a total of $6,866,664 and would spend not less than an additional $4.5 million to promote membership in the associations during the period January 1, 1980, through June 30, 1981; (5) CPG would transfer the custody and maintenance of the associations' membership lists to the associations; (6) CPG would no longer engage in Chapter activities; (7) CPG could no longer claim association endorsement for its products without permission; and (8) CPG was barred from advertising in CPG publications if another underwriter was selected.

Neither the defendants' motion to dismiss nor class certification had been acted upon when the parties presented the district court with the stipulation of settlement on November 6, 1980. The stipulation of settlement was filed with an affidavit of Michael Lesch, Esq., the Shea & Gould attorney for the plaintiffs, and a number of other documents, including the September 1980 agreement entered into by CPG and the associations. The bulk of the stipulation of settlement primarily confirmed the arrangements in the September 1980 agreement but added the following terms:

1. Competitive bidding procedures for the placing of insurance by the associations were agreed upon as was an eight-year period of duration for the consent decree and a five-year period for the duration of the group insurance contract placed in 1981 with Prudential Insurance Co.;

2. Complete and final termination of both state and federal actions;

3. Amendment of the state and federal complaints to include NRTA as a defendant and to broaden the plaintiff class to all persons who as of November 1, 1980, were members of either AARP or NRTA;

4. Defendants' consent to the certification of the broadened class in both the state and federal actions, with plaintiffs' counsel to apply for entry of a consent order accomplishing the foregoing and appointing a referee (a) to inquire into and report on the fairness, adequacy, and reasonableness of the settlement, (b) to recommend the form of notice to the intended plaintiff class, and (c) to review and make recommendation of an application by plaintiffs' counsel for an award of attorneys' fees;

5. If the referee did approve the foregoing, plaintiffs' counsel was to seek a state

supreme court order in effect confirming the referee's report and then seek a consent order in the federal action accomplishing all of the foregoing there (except the attorneys' fees which were only to be sought in state court);

6. The associations were to make available space in one issue each of their news bulletins and an NRTA magazine to give notice of the settlement and the state supreme court hearing ·(the parties agreeing that such notice constituted "sufficient notice to the members of the intended plaintiff class");

7. Plaintiffs' counsel were to apply to the state supreme court for a total fee, including disbursements, not in excess of $2.325 million, the first $1 million of which CPG was to pay 90% and the associations to pay 10%, and of anything over $1 million CPG was to pay 70% and the associations were to pay 30%, and defendants not to oppose any such application;

8. The stipulation provided the defendants an escape clause in the event that more than 10,000 class members opted out of the class and sought monetary relief or if the settlement were disapproved by the state supreme or the federal district court or were disapproved upon any appeal from either or both such courts. (In this connection we note that any opting-out member up to 10,000 would thus still retain any benefits accruing as a result of the stipulations).

Thereafter, on June 19, 1981, an order was filed providing for class certification and the complaint was amended, adding the NRTA as a defendant and broadening the class of plaintiffs from insurance-buying members of the AARP to include the members of Action for an Independent Maturity (AIM) (an additional 300,000 persons), the members of the NRTA (an additional 500,000 persons) and non-insurance-buying members of the AARP (an additional 10.5 million persons). The class in the settlement was four and one-half times larger than any that had been a party to the litigation up to that point.

## PROCEEDINGS AFTER THE STIPULATION OF SETTLEMENT

The proposed settlement proceeded like clockwork except that the objectors-appellants who have taken an appeal here protested the settlement before the referee, Peter James Johnson, who was appointed on November 21, 1980, to inquire into the fairness, adequacy, and reasonableness of the settlement, the form and method of notice proposed to be given to the class, and the attorneys' fees. Hearings were held, exhibits were received, and pretrial discovery material including deposition transcripts and documents marked at depositions were received. The report summarized the stipulation as making five major changes in the relationship between CPG and the associations: (1) competitive bidding for insurance; (2) opening association publications to general advertising; (3) changing the self-perpetuation of the trustees of the insurance trusts and restricting the influence of the associations' honorary presidents; (4) transferring from CPG to the associations functions previously performed by CPG, including promotion of new memberships and maintenance of· the associations' membership lists; and (5) termination· of exclusive endorsements by the associations of CPG's non-health· insurance products and services, including life, automobile, homeowner, and other insurance and travel services. For practical purposes, most if not all, as we have noted, had previously been accomplished by the September 1980 agreement.

The referee found that the settlement was conducted at arm's length and was fair, adequate, and reasonable. He noted that "substantially all the aims contemplated by the relief requested in the amended complaint" were accomplished by the settlement without· the "enormous expense of a trial, and the cost of anticipated appeals." The report noted that the plaintiffs' litigation position was vulnerable and that the law was unsettled where members of the class have received substantial benefits and proof of individual claims would "probably be extremely difficult because of the varia-

tions in individual coverage and premiums paid." Despite these hardships, however, two members of the AARP who had purchased AARP-endorsed group health insurance underwritten by CPG had received $500,000 in settlement of a claim for compensatory and punitive damages in a California Superior Court case, *Copitka v. Colonial Penn Group, Inc.*, No. 442574 (Cal.Super.Ct., San Diego Cty., 1979). *Copitka* was regarded as irrelevant to the possible success of a suit commenced under New York law because of California's unique punitive damage laws. The referee did not, however, explicitly consider the possible success of damage claims commenced in states other than New York, including California, and despite his view of the irrelevance of *Copitka* explicitly required disclosure of the *Copitka* settlement in the notice distributed to the class members through the associations' publications. He approved the application for attorneys' fees of $2.325 million, an amount approximately twice normal hourly rates for the participating attorneys and paralegals. The settling parties, in short, received from the referee everything that the stipulation had sought, with modification only in respect to the language of the notice to be given to the members of the now-to-be-expanded class of plaintiffs whose damage claims would be waived.

In accordance with the stipulation of settlement, plaintiffs' counsel applied to the federal court to enforce the settlement as approved by the referee. On June 19, 1981, the district court entered an order conditionally certifying the class and directing that notice of settlement be given and fixed a date for a hearing on the fairness, reasonableness, and adequacy of the settlement and directed that the hearing date be included in the notice. The fairness hearing was held on December 16, 1981. It consisted solely of a lawyers'/judge's colloquy, in the course of which the judge stated that he would review the attorneys' fee award, a matter in which plaintiffs' counsel quickly concurred. The hearing was adjourned so that Judge Griesa could review the papers filed in support of and in opposition to the settlement. At a subsequent hearing on August 4, 1982, Judge Griesa declared that he agreed completely with the findings of the state court referee as to the fee and entered an order accordingly.[1] The order did nothing more than in conclusory terms approve the settlement as above spelled out; no factual findings were made except that the state court referee's findings were incorporated in effect by implication. While hearings have been held, state Supreme Court Justice Rubin has not as yet approved the settlement.

## OBJECTIONS TO THE SETTLEMENT

Appellants have raised six primary objections[2] to the settlement. First, they object

---

1. Judge Griesa said at the conclusion of this colloquy:

    I have no reason to make any ruling or recommendation or take any action which would be contrary to what has been recommended by the referee in the State Court. I think that concludes these proceedings as far as the fee application.

    As far as the settlement, I agree completely with the findings of the referee as far as the fairness and adequacy of the settlement, and I have no reason for an extensive statement. The considerations are very thoroughly laid out by the referee. He summarizes the settlement and the problems, the objections that have been raised and deals with them. So I think that concludes my proceedings.

    What further paperwork has to be done?

2. Plaintiffs-appellees object to the objectors. They argue that objector Harriet Miller is a disgruntled former employee who is carrying on a personal vendetta; that attorney Yablonski's fees and disbursements were being paid by a third person whose identity has not been disclosed so that "the real party in interest behind these" objectors is this undisclosed third person; and that the objector Mountain Plains Congress receives money from the National Council for Senior Citizens which is said to be an arch-rival of AARP and NRTA and whose interest is said to be to continue to embroil the associations in litigation. However, even taking all these claims of the brief as true, so far as appears all of the named individuals objecting are members of the broadened class who have standing to object. We do not understand that the claim is made, or if it were that there is record support for it, that the undisclosed third person is paying fees and disbursements for all the objectors.

to the adequacy of the plaintiffs-appellees as class representatives, pointing out that, even as to the class that they originally sought to represent, insurance-buying members of AARP, the named plaintiffs had interests antagonistic to those of the class: plaintiff Malchman was the brother of class counsel; plaintiff Conway was the sister of the chauffeur of class counsel, plaintiff Lederer was the mother-in-law of class counsel, and plaintiff Stone was a close personal friend of class counsel. Second, the named plaintiffs could not be adequate representatives of the larger classes ultimately certified pursuant to the terms of the settlement, classes which included NRTA and AIM members as well as non-insurance buying AARP members. Third, contrary to Rule 23 and the decisions of this and other courts, e.g., *Plummer v. Chemical Bank,* 668 F.2d 654 (2d Cir.1982), the district court did not hold a proper reasonableness and fairness hearing and specifically failed to give proper weight to claims for money damages that could have been made or to the fact that the relief obtained in the settlement had already been obtained by the extrajudicial agreement among the defendants dated September 1980. Fourth, in a case such as this where the district court gave approval of a tentative class certification purely for settlement purposes, the rule is that a "court must be doubly careful in evaluating the fairness of the settlement," *Plummer,* 668 F.2d at 657, a call for careful scrutiny that the district court did not heed in perfunctorily approving the settlement. Fifth, no evidentiary foundation was laid within *Plummer,* 668 F.2d at 659, so as to permit intelligent review. Rather, the district court simply relied upon the state court referee's findings and report, which itself gives inadequate consideration to various objections made. Finally, the district court deferred to the state court on the question of fees, contrary to Rule 23, and

inappropriately permitted fee discussions to take place and agreement on the fee to be reached before all substantive issues affecting the class had been resolved. *See Prandini v. National Tea Co.,* 557 F.2d 1015, 1020 (3d Cir.1977).

The objectors-appellants would have us direct the district court to decertify the class and to disapprove of the settlement.

## THE ANSWERS OF THE SETTLING PARTIES

In addition to claiming that the objecting parties are entitled to no credibility because they have undisclosed and ulterior reasons for opposing the settlement, *see* note 2 *supra,* the appellees argue that the district court did not abuse its discretion, that it properly relied upon the state court referee, and that the settlement is fair and equitable. They argue that at least two of the named plaintiffs have no obviously disqualifying characteristics, and that neither direct nor derivative monetary claims would have been maintainable, partly because the cost of notice to such large members of the class would be too great, partly because the measurement of insurance claims would present complex problems of proof of damages with minimal claims on the part of any individual class members. The settling parties argue that although the litigation has been pending for several years and although the California *Copitka* case was settled,[3] no other members of the associations have come forth to assert their individual claims. They add that the derivative claims are valueless because the associations benefited enormously from their relationship with Colonial Penn. Moreover, CPG points to the million dollars a year it paid for advertising in the associations' publications and points to the benefit to the associations from CPG's efforts to increase association membership.

---

**3.** The *Copitka* suit was filed in 1979 and was settled by CPG for $500,000 on the eve of trial in March, 1981. Appellees claim this settlement was made because it was right at a time when CPG was attempting to persuade members of the existing group of AARP and NRTA to remain with it rather than to go with Pru-

dential Insurance Co. which was awarded the associations' health insurance from and after July 1, 1981, in accordance with the competitive bidding procedures of the September 1980 agreement. CPG was afraid of the "publicity attendant upon the trial."

The settling parties remind us that "the settlement provides for substantially all the relief [initially] sought in the action." Plaintiffs-Appellees' Brief at 37. They argue furthermore that the basic substance of the settlement was agreed to at the very outset of negotiations, well before the plaintiffs' attorneys' fee was considered. After the initial agreement counsel only sought to find the best mechanism for accomplishing the agreement. Interestingly, they do not tell us how, if that was the case, the attorneys' fees awarded were justified.

## DISCUSSION

We agree with objectors-appellants that we cannot intelligently review the settlement on this record and therefore must remand for findings.

■ There is no doubt that the district court must make an independent evaluation of whether the named plaintiffs were adequate representatives of the class of AARP insurance buyers they purported to represent at the time suit was brought, as well as of the broadened class ultimately approved by the order approving the settlement. Fed.R.Civ.P. 23(a)(4). Not only must the court examine whether plaintiffs had interests antagonistic to those of other class members, *Eisen v. Carlisle & Jacquelin,* 391 F.2d 555, 562–63 (2d Cir.1968), *vacated and remanded on other grounds,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), but also whether the class representative "possess[ed] the same interest and suffer[ed] the same injury" as the class members. *Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 216, 94 S.Ct. 2925, 2930, 41 L.Ed.2d 706 (1974). A judge has an obligation to consider whether the interests of the class are adequately represented, *see East Texas Motor Freight System, Inc. v. Rodriguez,* 431 U.S. 395, 403–06, 97 S.Ct. 1891, 1896–98, 52 L.Ed.2d 453 (1977); *Plummer v. Chemical Bank,* 668 F.2d at 659 & n. 4, and the court must examine the quality of representation with particular care where, as here, a class is sought to be broadly expanded after the litigation has been in process and for purposes of settlement, Fed.R.Civ.P. 23(c)(1). If the judge is not preliminarily satisfied that class members have been adequately represented in settlement negotiations, he has the power and the obligation to explore the issue before approving the settlement.

■ The same principles are applicable to the issues of adequacy, fairness and reasonableness of the settlement, approval of which is required by Fed.R.Civ.P. 23(e) and the case law. *See, e.g., In re Traffic Executive Association—Eastern Railroads,* 627 F.2d at 633–34; *Greenfield v. villager Industries, Inc.,* 483 F.2d 824, 833 (3d Cir. 1973). We have previously held that, while we do not expect the district judges to convert settlement hearings into mini-trials on the merits, we do expect them to explore the facts sufficiently to make intelligent determinations of adequacy and fairness, *Plummer,* 668 F.2d at 659; *see also In re Traffic Executive Association—Eastern Railroads,* 627 F.2d 631, 633 (2d Cir.1980), and we have strongly hinted that making findings of fact and conclusions of law whenever the propriety of the settlement is seriously in dispute is desirable. *Plummer,* 668 F.2d at 659. The trial judge determines fairness, reasonableness, and adequacy of a proposed settlement by considering (1) the substantive terms of the settlement compared to the likely result of a trial, *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424–25, 88 S.Ct. 1157, 1163–64, 20 L.Ed.2d 1 (1968); *In re Traffic Executive Association—Eastern Railroads,* 627 F.2d at 633, and (2) the negotiating process, examined in light of the experience of counsel, the vigor with which the case was prosecuted, and the coercion or collusion that may have marred the negotiations themselves. *Weinberger v. Kendrick,* 698 F.2d 61, 73 (2d Cir.1982); *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 465 (2d Cir.1974) (*Grinnell I*). *Grinnell I* sets forth the following as relevant factors in determining fairness of a settlement:

> (1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage

of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation[.]

*Robertson v. National Basketball Ass'n,* 556 F.2d 682, 684 n. 1 (2d Cir.1977) (citing *Grinnell I,* 495 F.2d at 463). These are factual questions for the district court, *Plummer,* 668 F.2d at 659, and "a district court's disposition of a proposed class action settlement should be accorded considerable deference," *Weinberger,* 698 F.2d at 73; *see also In re Corrugated Container Antitrust Litigation,* 643 F.2d 195, 207 (5th Cir.1981), *cert. denied,* 456 U.S. 998, 102 S.Ct. 2283, 73 L.Ed.2d 1294 (1982), though this principle applies with less force when, as here, settlement of a class action has been negotiated before the class has been certified. *Weinberger, supra,* at 73. The court's discussion need not be prolix to be thorough, and this court will affirm if its review of the record shows that the court "had before it sufficient materials to evaluate the settlement and came to the correct conclusion." *Weinberger,* 698 F.2d at 74 (parties' affidavits bearing on litigation history and evidence, discovery materials, and bankruptcy opinions provided satisfactory record). And if the record is adequate, an evidentiary hearing is not required unless the objectors raise "cogent factual objections to the settlement." *Id.* at 79; *Grinnell I,* 495 F.2d at 464 (objectors must make "clear and specific showing that vital material was ignored by the District Court").

■ Yet to survive appellate review, the district court must show it has explored comprehensively all relevant factors. *Protective Committee,* 390 U.S. at 434, 88 S.Ct.

at 1168; *Plummer,* 668 F.2d at 659. Here, Judge Griesa adopted by reference the state court referee's report, making no independent findings of fact[4] or conclusions of law. It is thus the referee's report, not the district court's final judgment, that this court is in effect reviewing. The state court referee evaluated the fairness, reasonableness, and adequacy of the stipulated settlement under standards for settlement of New York derivative actions. Thus, he found that the settlement (1) accomplished substantially all the relief sought by the amended state complaint; (2) avoided the time and expense of trial; (3) resulted from arm's length, non-collusive negotiation; (4) provided appropriate injunctive relief; and (5) justifiably waived money damages, in view of the difficulty of proving individual claims, the uncertainty of success, the importance of the damage waiver to the settlement agreement, and adequacy of notice to the plaintiffs that their right to sue for damages had been waived.

■ Though the referee's report contained some useful analysis of the reasonableness of the settlement, and the District Judge was entitled to rely on pertinent portions of that report, his reliance could not substitute for federal court inquiry as to matters pertinent to the federal suit that were either not considered or inadequately considered by the referee. Moreover, the referee considered some, but clearly not all, of the *Grinnell I* factors. His conclusions on damages, for example, may be misleading because he was assessing a state law breach of fiduciary duty/fraud claim, and not a federal law treble damages antitrust claim. At the very least as to that deficiency, the federal judge is required to hold a fairness hearing under *Plummer.* Finally, even if some relevant issues were considered by the referee, too many important questions were left open for us to approve Judge Griesa's adoption of the referee's conclusions. Our doubts fall under three broad headings.

---

**4.** He did ascertain that about 85% of plaintiffs' co-counsel's work was done in the state court

proceedings.

*Merits of plaintiffs' claims.* The referee found that the plaintiffs' claims suffered enough defects on the merits that the waiver of damages in exchange for injunctive relief was appropriate. We are troubled by his ready acceptance of this proposition. For example, nowhere is there a useful discussion of the problems raised for the defense by the exclusive advertising arrangement enjoyed by CPG or of CPG's husbandry of the associations' membership lists and drives. Our conviction that the federal merits of the plaintiffs' claims must be carefully weighed is reinforced by the CPG defendants' quick capitulation allowing use of the complaint as a basis for settlement. CPG Brief at 40.[5]

*Difficulty in proof of damages.* Plaintiffs' attorneys' argument that damages were never sought because the costs of class notification would be prohibitive ignores *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978), where the Court flexibly construed the principle of *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178–79, 94 S.Ct. 2140, 2152–53, 40 L.Ed.2d 732 (1974), that a party must bear the "burden of financing his own suit," and noted instances where it may be proper for a district court to require the defendant to bear the costs of class notifications. *Oppenheimer Fund, Inc., supra,* 437 U.S. at 356–59, 98 S.Ct. at 2392–94. Here, the associations and CPG were apparently able to perform notification with less difficulty and expense than the class plaintiffs, and the court could have exercised discretion under Fed.R.Civ.P. 23(d) to order, as ultimately happened, that notice be sent through the associations' membership magazines, or that the magazine must accept paid advertisements by class plaintiffs.

The referee's argument that waiver of damage claims was appropriate because proof of individual claimants' damages would be difficult is, as noted, not premised on federal antitrust laws where total damages may be three times as great and where

means may be available to assess the harm to the class even if proof of each plaintiff's damages would be difficult. More tellingly, it fails to address specifically the possibility that plaintiffs' loss could be measured as CPG's excess gain, *see Zeller v. Bogue Electric Manufacturing Corp.,* 476 F.2d 795, 802 (2d Cir.), *cert. denied,* 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973), a possibility that cannot be dismissed or simply overlooked in light of the statements in plaintiffs' counsels' affidavit that CPG's arrangement with the associations was very profitable, that "the opening of competitive bidding for the Associations' $270 million annual group health insurance has resulted in increasing the cash payout of group health insurance benefits to class members by over $39 million per annum" and that opening the associations' publications to other advertisers will increase advertising revenues by "over $19 million" in "the next five years alone." Lastly, the referee's dismissal of the *Copitka* case because of the peculiarities of California's punitive damages law only has a bearing on the New York state law fraud claims. It says nothing about suits brought in other states or under the federal antitrust laws when actual damages may be trebled. The bearing of the *Copitka* settlement on possible federal claims and whether notice of that settlement to the class members is sufficient to nullify its impact on the fairness of the settlement must also be reconsidered.

*Fees.* Judge Griesa's failure independently to investigate the issue of counsel fees leaves us with a sense of uneasiness, as the Judge left unanswered several important questions, including:

Why was a bonus awarded so large as to produce a total fee award that amounts to double the usual rates for counsel—for a total of approximately $240 per hour—regardless of the difficulty of the tasks performed?

What difficulty was involved that was extraordinary?

---

5. We do not intend to imply that quick settlements should be viewed with heightened suspicion; few cases will seek to dispose of the rights of so many persons who are not active participants in a suit on the basis of as little vigorous presettlement investigation of the merits of their claims as this one.

Why was all the time necessary for the mere pursuit of injunctive relief to which there was such rapid agreement in principle?

Was the recital of the draft proposal of defendants to the effect that plaintiffs' counsel had researched the legal principles applied to damage claims dropped in the executed stipulation and, if so, why?

Were the fees agreed upon before the settlement was reached or only after substantive issues were worked out?

Why were the associations to pay any part of the bill since the gravamen of the complaints was that the associations (or their members) had lost money by virtue of CPG's actions?

A federal court approving the award of fees in this situation, where state and federal suits are being settled in one agreement, must make its own independent valuation of fairness and reasonableness; it cannot simply rely on the state referee's.[6]

Reversed and remanded for proceedings in accordance with this opinion.

NEWMAN, Circuit Judge, concurring:

I concur in Judge Oakes' comprehensive opinion and add a few words only to fill out the context in which the settlement was reached and to emphasize that our concern for more detailed analysis by the District Judge is not an intimation either way as to whether or not the settlement should be approved. The Associations had entered into an exclusive arrangement with the Colonial Penn Group at a time when no other insurer appeared willing to write group health insurance policies for the elderly. The risk that CPG took turned out to be advantageous for it, and it made substantial profits. Once the profitability of this type of insurance was demonstrated, the continued existence of an exclusive arrangement between the Associations and CPG was no longer in the best interests of the Associations' members. Whether the arrangement

ever was, or at some point might have become, unlawful is, of course, quite a different matter. In any event, the Associations and CPG, no doubt prodded by the initiation of state and federal lawsuits, agreed in September 1980 to sever the exclusive relationship. Their agreement includes a provision requiring CPG to pay the Associations $6.8 million and to spend for the benefit of the Associations another $4.5 million.

In this context the lawsuits were settled on terms that provide the plaintiffs with virtually all of the relief they sought in their complaints. The settlement proposes to secure in an enforceable consent judgment not only the contractual rights inuring to the Associations by virtue of their 1980 agreement with CPG, but also the very important additional requirement that the Associations will invite competitive bidding for the opportunity to provide health insurance for their members.

Judge Griesa, agreeing with the State Court referee who considered the proposal at the request of the State Court, concluded that the achievement of far-reaching injunctive relief and the forgoing of damages that plaintiffs had never sought was a fair and reasonable settlement of the litigation. Judge Oakes' opinion for the Court properly calls upon Judge Griesa to analyze the matter in more detail so that we will have a sound basis for exercising our somewhat narrow scope of appellate review in such matters. I understand our call for further analysis to be just that, without any attempt to circumscribe the permissible conclusions that the District Judge may reach upon completing his further consideration of the matter.

LUMBARD, Circuit Judge, concurring:

I concur in the opinion of Judge Oakes and also in the concurring opinion of Judge Newman.

6. In fairness to the district judge, he did insist on making an independent evaluation. He simply left unanswered certain questions, the answers to which are necessary for purposes of our review.