Roderick PLUMMER, Raymond W. Armorer, Neville F. Caesar, and all others similarly situated, Plaintiffs,

v.

CHEMICAL BANK, Defendant.

No. 80 Civ. 7364 (WCC).

United States District Court,
S.D. New York.

Jan. 31, 1984.

As Amended Feb. 2, 1984.

Vladeck, Waldman, Elias & Engelhard, P.C., New York City, for plaintiff Roderick Plummer; Judith P. Vladeck, Joseph J. Garcia, Sarah E. Siskind, New York City, of counsel.

Dinerstein & Lesser, P.C., Jericho, N.Y., for plaintiffs Raymond W. Armorer and Neville F. Caesar; Robert J. Dinerstein, Alan R. Aledort, Jericho, N.Y., of counsel.

Epstein, Becker, Borsody & Green, P.C., New York City, for defendant; Ronald M. Green, Susan Schenkel-Savitt, Carol S. Bernheim, New York City, of counsel.

Silverman & Harnes, New York City, for objectors Herman I. Taitt and Lewis Straker; Sidney B. Silverman, Joan Harnes, New York City, of counsel.

## OPINION AND ORDER

CONNER, District Judge.

Plaintiffs commenced the instant action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981, purportedly on behalf of a class of Black officials, managers, and professionals employed by defendant Chemical Bank ("Chemical" or the "Bank"). The case is currently before the Court upon the motion of plaintiff Roderick Plummer ("Plummer") for approval of a proposed settlement and consent decree entered into on October 6, 1983 (the "Consent Decree") by his attorney Judith Vladeck ("Vladeck"), assertedly on behalf of the class, and Chemical. See Rule 23(e), F.R. Civ.P. Contemporaneously with that approval, Plummer seeks to have the Court certify the class described in the Consent Decree pursuant to Rule 23(c)(1), F.R.Civ.P. While defendant Chemical joins in Plummer's motion, the other named plaintiffs, Raymond W. Armorer ("Armorer") and Neville F. Caesar ("Caesar"), and a number of non-party class members oppose it.

This is not the first time this Court has been asked to approve a proffered settlement of this action. Indeed, the Consent Decree is the third permutation of a proposed decree that was originally before me in early 1981. In an Opinion and Order dated July 10, 1981, familiarity with which is presumed, I refused to approve a proposed consent decree executed on February 10, 1981 by Vladeck, who at that time represented all of the named plaintiffs in this action, and Ronald Green ("Green"), attorney for Chemical (the "First Decree"). *See*

*Plummer v. Chemical Bank*, 91 F.R.D. 434 (S.D.N.Y.1981) (Conner, J.) (hereinafter *"Plummer I"*), *aff'd*, 668 F.2d 654 (2d Cir.1982). That decision was affirmed by the Court of Appeals for the Second Circuit, without prejudice to a renewed application in this Court after the parties supplemented the record and cured the defects that existed in the First Decree. *See generally* 668 F.2d 654.

In December 1982, the parties submitted for Court approval a revised version of the First Decree, entered into on December 13, 1983 by Vladeck, who by this time represented only two of the original four named plaintiffs,[1] and by Green on behalf of Chemical (the "Second Decree"). For the reasons set forth in an Opinion and Order dated March 22, 1983, I again refused either to certify the putative class or to approve the revised decree. *See generally Plummer v. Chemical Bank*, 97 F.R.D. 486 (S.D.N.Y.1983) (Conner, J.) (hereinafter *"Plummer II"*). Vladeck and Chemical subsequently agreed upon a further modified version of the First Decree, which is currently before the Court for approval.

Following a period for notice to members of the putative class, the Court on November 28 and December 2, 1983 held an evidentiary hearing on Plummer's motion for class certification and approval of the Consent Decree. In addition to the evidence adduced at that hearing,[2] the Court has considered the depositions, affidavits, and memoranda submitted both in support of and opposition to the motion. This Opinion and Order incorporates the Court's findings of fact and conclusions of law pursuant to Rule 52, F.R.Civ.P. For the reasons stated below, the motion for certification and approval is granted.

*Background*

The genesis of this action arose in the mid-1970's, when a group of Black employees of Chemical, mostly officers of the Bank, formed a semi-formal organization known as the Committee of Concerned Black Employees (the "Committee"). *See* tr.[3] at 75–76. From its inception, the Committee met regularly, normally on a monthly basis, to consider and attempt to enhance the opportunities available for Black professionals at the Bank. *See id.* Generally, most members of the Committee were displeased with promotion and training opportunities, although some also had salary complaints. *See id.* at 76.

As part of the Committee's ordinary activities, members met on occasion with Bank representatives in an effort to bring the group's concerns to Chemical's attention. *See id.* at 77–78. On March 30, 1979, following a March 19th meeting with several top officers and directors of Chemical, the Committee sent these officials a memorandum summarizing its grievances and proposing recommended solutions. *See* Ex. B to Vladeck Aff.; tr. at 79. The memorandum was signed by five members of the Committee, including plaintiff Plummer and objectors Herman Taitt ("Taitt") and Lewis Straker ("Straker"). *See id.* The four primary concerns of the group, as identified in that memorandum, were included: (1) inadequate opportunities for development and career advancement for Black employees; (2) disparate salary treatment for Black employees when measured against their White counterparts; (3) lack of any effective grievance committee to handle individual complaints of Black employees; and (4) inadequate training program opportunities for Black employees. See Ex. B to Vladeck Aff.

---

1. At the time the Second Decree was submitted to the Court, the fourth of the four original named plaintiffs in this action, Gwendolyn Moore, reached a separate settlement with Chemical and terminated her employment with the Bank. *See Plummer v. Chemical Bank*, 97 F.R.D. 486, 487 n. 1 (S.D.N.Y.1983).

2. The Court has not considered plaintiff's exhibit 3, the transcript and stenographic notes of a

phone conversation between Sidney Silverman ("Silverman"), attorney for objectors Herman I. Taitt and Lewis Straker, and Joseph Garcia, attorney for Plummer.

3. All citations to "tr." refer to the transcript of the hearing which commenced on November 28, 1983 and continued on December 2, 1983.

Following Chemical's failure adequately to respond to the suggestions contained in the memorandum, *see* tr. at 79, some members of the Committee, including Plummer, became dissatisfied with the Bank's efforts and began to consider other methods of pressing their grievances. *See id.* at 81–82. Sometime in the spring of 1979, these employees consulted Vladeck about the possibility of commencing legal action against Chemical to remedy the allegedly discriminatory employment practices which they believed were impairing their career opportunities as well as those of other Black officials, managers, and professionals employed by the Bank. *See* tr. at 82; Vladeck (12/13/82) Aff. at ¶ 3. Following that initial contact, Vladeck met during the summer of 1979 with numerous Black employees and accumulated extensive information in order preliminarily to evaluate the potential scope and strength of the Black officers' case. *See* tr. at 82–83; Vladeck (12/13/82) Aff. at ¶¶ 4, 9. After satisfying herself that the Black employees appeared to have a *prima facie* claim for discriminatory promotion and placement, Vladeck advised the individuals who had consulted her of the various ways they could proceed. *See* tr. at 83; Vladeck (12/13/82) Aff. at ¶¶ 10–18.

After receiving this advice, the Committee voted formally not to take a position. See *tr.* at 83. Several individuals, including the named plaintiffs in the instant action, were willing to move forward, however, and they authorized Vladeck to attempt to negotiate a settlement with Chemical as an alternative either to litigation or to simply dropping the matter.[4] *See* tr. at 83; Vladeck (12/13/82) Aff. at ¶¶ 19–20. Accordingly, in August 1979, Vladeck initiated discussions with Chemical's counsel, Green. *See* Vladeck (12/13/82) Aff. at ¶ 20.

In November and December 1979, as these negotiations continued, the original four named plaintiffs filed complaints against Chemical with the Equal Employment Opportunity Commission ("EEOC"). *See* Vladeck (12/13/82) Aff. at ¶ 22. On September 29, 1980, each of the named plaintiffs obtained a "right to sue" letter from the EEOC. Then, on December 24, 1980, just four days before the statutory 90-day period for instituting suit expired, the complaint in the instant action was filed. *See id.* at ¶ 34.

*The Consent Decree*

Although the Consent Decree is identical in form and concept to both the First and Second Decrees, previously rejected by this Court, it differs in several significant respects. In denying plaintiffs' motion for approval of the First Decree, I was influenced primarily by the following: (1) the record in support of the proposed decree was inadequate; (2) the unorthodox manner in which the settlement was negotiated militated against approval on the basis of the record then before the Court; and (3) the proffered decree provided, without explanation, substantially greater benefits for named plaintiffs than for other class members. *See Plummer I*, 91 F.R.D. at 438. Although the parties negotiated several modifications of their agreement on remand from the Court of Appeals, these changes failed to address the essential deficiencies inherent in the First Decree. Like the First Decree, the Second Decree inexplicably provided greater guaranteed relief for named plaintiffs than for ordinary class members. While this condition, standing alone, would have mandated denial of the motion for approval, the Second Decree also provided for an unstructured grievance procedure that, in view of its importance in the overall framework of the decree, rendered the proposed settlement inadequate from the perspective of the absent class members. *See generally Plummer II*, 97 F.R.D. at 488–89. In the Consent Decree, the parties have addressed both of these concerns—removing all disparate relief for named class members and placing definite time constraints on each step of the grievance process—and have also provided that interest generated on the monies set aside by Chemical under the

---

**4.** Indeed, this was the course recommended by Vladeck. *See* Vladeck (12/13/82) Aff. at ¶ 19.

decree will be added to the fund established for the benefit of class members.

The major provisions of the Consent Decree can be summarized as follows:

Section II: The Court will retain jurisdiction over the matter to resolve any disputes that may arise during the term of the Decree.

Section IV: All class members who failed to opt out of the class are deemed to have released Chemical from any claim of employment discrimination arising from acts or omissions by the Bank through the effective date of the Consent Decree.

Section V: The Decree becomes effective 31 days following approval by the Court, and expires three years after that date. If at the time the decree expires the Promotion Fund or Scholarship Fund created by § VIII of the Decree has not been exhausted, Chemical may either continue those programs until the Funds are completely expended or distribute the unexpended monies on a *pro rata* basis to prior recipients. In no event will any monies provided for class benefits revert to the Bank.

Section VI: The class consists of all Blacks who on February 21, 1981 (the notice date of the First Decree) were employed in New York City by Chemical in the Officials, Managers, and Professional Standard Form 100 (EEO–1) categories, and who are still employed by the Bank on the effective date of the Consent Decree.

Section VII: For each relevant job category, the Decree sets a "goal," which is a percentage figure representing a target proportion of Black employees in each category. The Bank must make good faith efforts to attain the goals established in this section and to assure that Black employees are not restricted to any particular areas of Bank employment. Chemical's compliance with this undertaking will be measured by looking to the totality of circumstances incident to hiring and placement. The Bank must review its progress towards these goals annually, and report to class counsel. In any case where the Bank does not meet an annual placement goal, it is obligated to document the reason for its failure and to demonstrate that it made good faith attempts to attain the goal. The goals set forth in the Decree are derived directly from the Bank's existing affirmative action program.

Section VIII(a): Chemical will establish a $400,000 interest-bearing fund for promotion payments. Any class member who, during the life of the Decree, is promoted into or within any job group for which minority hiring goals have not been met will receive a promotion payment provided such class member's years of employment at Chemical exceed by two or more years the average total number of years of employment, at the time of promotion, of White employees receiving a comparable promotion into or within such job group during the previous calendar year. The amount of the promotion payment will be determined as follows:

| More than 2 but less than 4 excess years | - | $ 2,500 |
| At least 4 but less than 5 excess years | - | $ 4,000 |
| At least 5 but less than 10 excess years | - | $ 6,500 |
| 10 or more excess years | - | $10,000 |

Section VIII(b): Chemical will establish a $100,000 fund for scholarship payments for any educational or training purpose selected by the Bank and the eligible class member. Any class member who is promoted within the Officials, Managers and Professionals groups is entitled to a scholarship payment not to exceed $1,000. If the cost of the selected training exceeds $1,000, the additional amount may be assumed by the Bank, but will not be deducted from the $100,000 fund. In order to receive either a promotion or a scholarship payment, a class member must execute a general release which relieves Chemical of liability for any act of discrimination through the date of the release.

Section X: In order to promote internal resolution of equal employment disputes, the Decree establishes a grievance procedure, which contains the following steps:

(1) If a Black employee has an EEO problem arising under the Decree, he must

first discuss the matter with his immediate supervisor, unless there is reason to believe such discussions would be futile. The supervisor must investigate and attempt to resolve the employee's complaint within 10 business days.

(2) If the complaint is not resolved at step 1, the employee must next discuss the problem with a representative of INTERCOM, an established group within the Bank consisting of employees who have been specially trained to resolve personnel problems. The representative of INTERCOM must make a good faith effort to resolve the complaint within 10 business days, but in no event may INTERCOM retain jurisdiction over the dispute for more than 15 business days.

(3) If the Black employee's grievance is still not resolved, it may next be presented to the Ombudsman. The Ombudsman is a bank-appointed representative with broad jurisdiction, including authority to hear any complaints of class members alleging race discrimination during the term of the Decree. After investigating a complaint, the Ombudsman must issue a recommendation that: (a) the issue warrants no further action; (b) the issue warrants further action and involves matters of concern only to the individual class member; or (c) the issue warrants further action and involves issues of more general concern. Where the Ombudsman sustains a claim of discrimination, he must recommend a remedy in accordance with the payment schedule set forth in § VIII of the Decree. If the Ombudsman concludes that the matter warrants no further consideration, he must issue a recommendation within 30 business days after receiving the complaint. If, however, the Ombudsman concludes that the complaint involves a substantial matter of individual concern, the Ombudsman must make a recommendation to the appropriate Bank officials—including, as a second step, the officer of the Bank's Human Resources Division—who are required to give substantial weight to the findings and recommendations of the Ombudsman. In this situation, the Bank's final decision must be rendered within 55 business days of the date the Ombudsman receives the complaint. Finally, if the Ombudsman believes the issue to be of general concern, he must present his recommendation directly to the head officer of the Human Resources Division. If the Ombudsman and the concerned Black employee are both dissatisfied with the decision of this officer, the matter may be presented to the President of the Bank. In this third situation, a final Bank decision must be issued no more than 60 business days after the complaint was first presented to the Ombudsman.

Section XI: The Decree provides that the Court will appoint a Special Master pursuant to Rule 53, F.R.Civ.P. The Court will establish the scope of the Special Master's responsibilities, which shall include, at minimum, the authority to review any final decision of the Bank, when presented for consideration by a class member, in any matter where there had been a recommendation, either favorable or unfavorable, by the Ombudsman. The Decree contemplates that the Special Master proceeding will be quasi-legal in nature, and that the class member as well as the Bank will probably be represented by counsel, with fees to be established by the Special Master.

Section XX: Chemical agrees to pay reasonable attorney's fees to Vladeck, Waldman, Elias & Engelhard, P.C., counsel for Plummer and proposed class counsel. The Decree does not affect the right of any other counsel of record to apply to the Court for attorney's fees, but Chemical reserves its right to contest any such application. Chemical is also obligated to pay class counsel's fees in connection with counsel's continuing responsibilities under the Decree.

*Discussion*

■■■ Adequacy of representation and fairness of compromise are questions of fact for the Court. *Plummer v. Chemical Bank,* 668 F.2d at 659; *see Malchman v. Davis,* 706 F.2d 426, 434 (2d Cir.1983). In determining whether the named plaintiffs are adequate representatives of the entire class, the court must consider not merely whether plaintiffs have interests antagonis-

tic to those of other class members, but also whether the class representatives have suffered the same injury and are aligned in interest with the class as a whole. *Malchman,* 706 F.2d at 433. Moreover, in passing upon a proposed settlement of a class action, the court must satisfy itself that the compromise is fair, adequate and reasonable from the perspective of absent class members, and is not influenced in any way by fraud or collusion.[5] *See Plummer,* 668 F.2d at 658. This determination requires the court to compare the substantive terms of the settlement against the likely outcome of a trial, and to examine "the negotiating process ... in light of the experience of counsel, the vigor with which the case was prosecuted, and the coercion or collusion that may have marred the negotiations themselves." *Malchman,* 706 F.2d at 433. The factors relevant to that inquiry include:

> (1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Id.* at 433–34, *quoting Robertson v. National Basketball Ass'n,* 556 F.2d 682, 684 n. 1 (2d Cir.1977); *see Detroit v. Grinnell Corp.,* 495 F.2d 448, 463 (2d Cir.1974).

Paramount among these factors is the strength of the class's case balanced against the terms of the settlement offer. *Plummer,* 668 F.2d at 660.

### A. Adequacy of Representation

[5] The evidence adduced at the November 28, 1983 hearing clearly demonstrates Plummer's adequacy as a class representative. The complaint in the instant action alleges discrimination by Chemical against its Black officers, managers, and professionals in the terms and conditions of employment. As the March 30, 1979 memorandum from the Committee of Concerned Black Employees indicates, at the time the Black officers consulted Vladeck, they were concerned primarily with an alleged lack of upward mobility at the Bank, inadequate compensation when measured against their White counterparts, exclusion from training programs, and ineffective grievance procedures. *See* Ex. B to Vladeck Aff.; tr. at 79; *see also* tr. at 18–19. These complaints were echoed by Black employees who spoke to Vladeck during the summer of 1979, just before negotiations with Chemical commenced. *See* Vladeck (12/13/82) Aff. at ¶ 4.

Plummer's individual complaints are typical of these. He testified that after he received his undergraduate degree from Princeton and law degree from Columbia, he went to work for Chemical. As his Employee Work History Report[6] indicates, he received a starting salary of $15,000 per year and a job title of "attorney II," a position he describes as an assistant counsel. *See* Pl.Ex. 1; tr. at 73. Although Plummer was initially assigned to the trust department of the Bank, in 1981 he was involuntarily transferred into the legal department as part of Chemical's overall centralization of its legal staff. *See* tr. at 62–63, 73–74. This was a lateral transfer which did not involve a promotion. *See id.*

---

5. Voluntary settlements are a preferred means of achieving Title VII's goal of eradicating employment discrimination. Such compromises often produce more favorable results for the class than would a more sweeping judicial order, which could engender opposition and resistance. *See Kirkland v. New York State Dep't of Corr. Services,* 711 F.2d 1117, 1128, 1128 n. 14 (2d Cir.1983). In addition, settlements reduce the cost of litigation and promote judicial economy. *Id.*

6. The attempt by counsel for Armorer and Caesar to discredit the veracity of documents provided by Chemical is wholly ineffectual. This is especially true with respect to ordinary printouts generated by Chemical's central computer.

He continues to do the same work he did prior to the transfer. *See* tr. at 74.

During his approximately eight and one-half years with Chemical, Plummer's salary has risen to its current level of $42,400 per year. *See* Pl.Ex. 1. Although objectors' counsel has attempted to demonstrate that Plummer's salary increases subsequent to the commencement of the instant action are somehow rewards for his endorsement of the Consent Decree, those charges are utterly without support. As Chemical's managing attorney noted at the hearing, Plummer's most recent raise, which constitutes more than one-half of his salary increase since 1979, came as part of a bank-wide upgrade of the salaries of attorneys. *See* tr. at 62. Indeed, quite contrary to the objectors' unsupported suggestion that Plummer has received a special raise that somehow places him at odds with the rest of the class, Plummer's salary appears, as he contends, to be low for someone with his educational background and years of service with the Bank. The general salary range for attorneys in the legal department is between $40,000 and $80,000, with starting salaries in the $30,000 to $34,000 range. *See* tr. at 66–67; *see also* tr. at 106. Thus, with more than eight years' experience at the Bank, Plummer earns approximately $10,000 more than entry level attorneys and is within $2,500 of the bottom of the general salary range for the legal department. Clearly these figures lend credibility to Plummer's complaint that he, like many others in the class, is a victim of salary discrimination. In addition, Plummer complains that he has been excluded from several bank training programs—including the now-defunct Harvard program and the Stanford program—which he alleges serve as a training ground for future Bank leaders. *See* tr. at 80. These claims, too, are typical of the class.

Moreover, Plummer's desire zealously to promote the claims of the class cannot be doubted. Prior to the initiation of this action, Plummer was at the forefront of the Black employees' efforts to work with the Bank to resolve their problems. He was an active member of the Committee and was instrumental in carrying the group's complaints forward when the Committee stalled and was unable to agree upon a course of action. Indeed, that Plummer has the respect of many of his fellow Black employees is evinced by the fact that he was nominated by the Committee as one of several people qualified to fill the vacancy as Chemical's affirmative action officer. *See* tr. at 86–88. Accordingly, I find that Plummer's interests in this matter are consistent with those of the class, that his individual complaints are the same as those of the class as a whole, that he is a respected and persistent leader, and, therefore, that he is an adequate representative of the class defined in the Consent Decree.[7]

B. Fairness of the Compromise

In both *Plummer I* and *Plummer II*, I expressed concern over the sequence of events leading to the presentation of the Consent Decree for the Court's approval. The normal and preferred route in actions pursuant to Rule 23, F.R.Civ.P., is to have the class certification issue determined prior to settlement discussions. *See Plummer I*, 91 F.R.D. at 440; Manual for Complex Litigation (Fifth Ed.) § 1.46. The rationale for looking with disfavor upon pre-designation negotiations rests upon a fear that plaintiffs' self-appointed counsel may be pressured to act amenably to the defendant, lest the defendant chose to negotiate with someone else. *See id.* In the instant case, the parties had already engaged in substantial negotiations and were close to a compromise before the action was even filed, and, after ironing out the

---

**7.** None of the parties to this action, including the objectors, doubt that the action is properly maintainable as a class action. There are currently 417 members of the putative class; consequently joinder of all members is impracticable. *See* Bernheim (11/15/83) Aff. at 8; Ex. A to Bernheim Aff.; Rule 23(a)(1), F.R.Civ.P. Questions of Title VII law are applicable to all class members' claims, and Chemical's general policies toward its Black employees are relevant on a classwide basis. *See* Rules 23(a)(2) and (3), F.R.Civ.P. Finally, as noted above, Plummer is an adequate representative of the class. *See* Rule 23(a)(4), F.R.Civ.P. Accordingly, this action may properly be certified as a Rule 23(b)(2) class action.

wrinkles in their agreement, they submitted the First Decree to the Court less than two months after this action was instituted. *See Plummer I*, 91 F.R.D. at 440; Vladeck (12/13/82) Aff. at ¶¶ 31–32, 35; tr. at 161–63. Indeed, plaintiffs have never moved for certification of a class and designation of class counsel independently of a motion for judicial approval of a settlement decree. While these premature negotiations by undesignated class counsel do not, standing alone, preclude judicial approval of the Consent Decree, the dangers inherent in the process require the Court closely and carefully to scrutinize the settlement negotiations and the resulting Consent Decree. *See Plummer*, 668 F.2d at 658.

■ Despite the objectors' continuous and unsupported attempts to undermine the credibility of the negotiations between Vladeck's firm and Chemical's counsel, the evidence strongly supports a finding that the process leading up to the Consent Decree was hard fought and involved arm's-length negotiations in which the interests of the class were more than adequately represented. Vladeck, her firm, and Chemical's counsel are all highly experienced in Title VII litigation. Vladeck herself has had over thirty-five years' experience as an attorney, and has personally represented plaintiffs in eight employment discrimination class actions. *See* Vladeck (12/13/82) Aff. at ¶ 59. In addition, Vladeck's partner who participated in the negotiations, Joseph Garcia, is also an experienced attorney who has spent at least the past seven years engaged primarily in Title VII litigation. *See* tr. at 15–16. On the other side, Green, Chemical's counsel, has a distinguished background, including a stint with the Department of Labor, where he served as Counsel for Civil Rights and ultimately as Associate Solicitor of Labor for Labor Relations and Civil Rights, in which he developed a high level of expertise in the Title VII field. *See* Green (11/24/82) Aff. at ¶ 2; Ex. A to Green (11/24/82) Aff.

Moreover, the descriptions of the negotiations leading up to the Decree are consistent with the character of advocacy one would expect from professionals of such ability. When Vladeck first approached Green, Chemical refused to undertake serious substantive discussions with her until it was satisfied that she represented a cross section of the Black professional employees. *See* tr. at 161; Green (11/24/82) Aff. at ¶ 4. Consequently, counsel for Chemical and the named plaintiffs jointly retained Professor Matthew Kelly, a professor at Cornell University experienced in labor arbitration and mediation, to determine the general representative nature of Vladeck's clients. *See* Green (11/24/82) Aff. at ¶ 5. On August 29, 1980, Professor Kelly issued a report which indicated that Vladeck's clients were sufficiently representative to justify, from the Bank's perspective, continued discussions. *See id.;* Ex. B to Green (11/24/82) Aff.

It was only after the parties received Professor Kelly's recommendation, approximately one year after Vladeck first approached Green, that serious negotiations began. *See* tr. at 162. Prior to that time, both sides spent approximately nine months arguing about the terms of a stipulation of confidentiality, which Chemical required before it would allow plaintiffs access to internal Bank documents. *See* tr. at 161. Following the execution of a stipulation and receipt of Professor Kelly's recommendation, the parties began exchanging documents in much the same manner as would have occurred had they been engaging in discovery pursuant to the Federal Rules of Civil Procedure. *See* Green (11/24/82) Aff. at ¶ 7; Vladeck (12/13/82) Aff. at ¶¶ 26–27.

The course of negotiations between Vladeck and Green was far from smooth. At several times during the process, Vladeck temporarily broke off negotiations. *See* tr. at 27, 162. Moreover, once Vladeck's clients obtained their right to sue letters in September 1980, Chemical was under definite pressure to reach a settlement within 90 days in order to avoid a court action. *See* tr. at 162. Nevertheless, at the time plaintiffs commenced the instant action, Vladeck and Green had not been able to reach a final settlement. I find absolutely no credible evidence in the record to support the objectors' contentions that there

was collusion between Vladeck and Chemical's counsel. Indeed, the evidence suggests that even though negotiations in this dispute were held prematurely, in light of the caution contained in the Manual for Complex Litigation, they were nevertheless undertaken vigorously by experienced and able counsel. The interests of the absent class members were well represented.

Moreover, even after this Court expressed its concern with several aspects of the First Decree, the parties continued their negotiations in good faith in an effort to correct these deficiencies. In the period following this Court's rejection of the First Decree, Vladeck was able to negotiate, *inter alia*, an increase in the promotion fund, a provision for a Special Master, definite time limits on each step of the grievance procedure, and a provision for accrual of interest on the monies set aside for promotion payments. All of these changes, which are incorporated in the Consent Decree, provide additional benefits for class members. These changes also reflect the input of counsel for the objectors, who were allowed to participate in the post-First Decree negotiations. *See, e.g.,* tr. at 29–30. Thus, despite the uncertain beginnings from whence this action grew, I am satisfied that the interests of the class were vigorously represented in the negotiations leading to the Consent Decree.

The statistical evidence presented supports the conclusion of Vladeck and Garcia that, as a class, plaintiffs have a *prima facie* case of promotion discrimination, but no independent equal pay or salary discrimination claim—*i.e.,* any salary claim would be derivative of the promotion discrimination claim. *See* tr. at 21–24; Vladeck (12/13/82) Aff. at ¶¶ 28–29. Looking at the group of officers, managers, and professionals as a whole, there is little disparity between Black and White employees when comparing strictly salary and years of service. *See* tr. at 21; Ex. H to Vladeck Aff. Moreover, if these figures were subjected to a regression analysis, the standard statistical tool for introducing additional variables into the relationship, it appears to the Court even more unlikely that plaintiffs could, as a class, sustain a salary discrimi-

nation claim were this case ultimately to proceed to trial.

However, Black availability figures demonstrate that, at least on a numerical level, Blacks are increasingly underutilized at the higher levels of Chemical's management. *See* tr. at 22–26; Vladeck (12/13/82) Aff. at ¶¶ 28–29. As Garcia notes, and Chemical's counsel also recognizes, these figures could be adequate to support a *prima facie* case of exclusion and promotion discrimination. *See* tr. at 26; 163–64.

■ Measured against the strength of their case, the Consent Decree is an adequate compromise of the class members' complaints. Even assuming that plaintiffs could sustain a *prima facie* showing of exclusion and promotion discrimination, the Court must also be aware of the risk that Chemical will be able to overcome the statistical proof and successfully defend against plaintiffs' claims. Moreover, the Court is cognizant that even if plaintiffs were able to sustain their claims at trial, it would be at least several years before the action actually proceeded through a trial and an appeal, and class members finally received any benefits. In addition to such a delay, the trial process imposes substantial costs on all involved, and a final resolution by judicial fiat may well engender opposition and resistance which could be avoided by a negotiated compromise. *See Kirkland,* 711 F.2d at 1128 n. 14.

The Consent Decree provides substantial and immediate benefits to class members. The $400,000, plus accrued interest, provides an automatic fund from which promoted employees can receive benefits without any showing that they have been discriminated against. In addition, a promoted employee is automatically entitled to a $1,000 scholarship payment from a separate $100,000 fund. Even though the magnitude of the payment may not be as great as the amount a plaintiff might recover after a full trial, the immediacy of the relief and the provision that no explicit showing of discrimination is necessary in order to obtain a payment serves to equalize this potential, and at this point

hypothetical, disparity. Moreover, although all Black employees cannot conceivably be promoted, and therefore cannot all be eligible to receive an automatic payment, the Consent Decree also provides a procedure through which any class member who can in fact demonstrate discrimination will receive a payment, regardless of whether the $400,000 fund has previously been exhausted.

Another significant benefit of the Decree is that Chemical has undertaken to accelerate its affirmative action goals into the effective period of the Decree. While previously Chemical's attempts to meet those goals were voluntary, subject merely to administrative criteria, the Bank's efforts at compliance are now subject to this Court's scrutiny. Thus, Chemical's failure to take good faith steps to meet the established goals could subject the Bank to a citation for contempt and possibly other sanctions.

The other major, tangible benefit to class members under the Consent Decree is the implementation of a dispute resolution procedure. While I was openly critical in *Plummer II* of the "tortuous" nature of the grievance procedure contained in the Second Decree, *see* 97 F.R.D. at 489, the modifications subsequent to that opinion, which place definite time constraints on each step of the process, satisfy in large part, my prior concerns. Although there is some dispute between the proponents and opponents of the Decree concerning whether resort to INTERCOM should be removed as a step in the grievance process, the proponents' position that INTERCOM should be retained because it will survive the expiration of the Decree appears to the Court to be sound. Finally, the most significant benefit of this aspect of the Decree is the provision for an independent, court-appointed Special Master. The Special Master is vested with broad authority to hear complaints by class members during the effective term of the Decree, and in many ways the Special Master proceeding provides an accessible and less onerous means of resolving a particular dispute than resort to a traditional judicial forum.

Because of the unusual circumstances surrounding this action, the Court deemed it appropriate, prior to deciding whether to approve the Consent Decree, to obtain a non-binding indication of the class members' support for the proposed Decree. Accordingly, along with notice of the November 28, 1983 hearing and Court-approved summaries of the terms of the Decree, all 417 class members were sent anonymous ballots to be returned directly to the Court, on which they could indicate either support for or opposition to the proposed Decree. The Court is reinforced in its decision to approve the Decree by the fact that a majority of the class members who responded to the straw poll favored approval.[8] Similarly, when notice of the First Decree was sent out in 1981, only 25 members of a putative class which at that time exceeded 500 members decided to opt-out. This implied expression of support likewise reassures the Court of the correctness of its decision to approve the Consent Decree.

*Summary*

For the reasons stated above, Plummer's motion for certification of the class described in § VI of the proposed Consent Decree is granted. Plummer is an adequate class representative and the firm of Vladeck, Waldman, Elias & Engelhard, P.C. is adequate class counsel. The motion for approval of the Consent Decree dated October 6, 1983 is also granted. The Decree is a fair, reasonable and adequate compromise from the perspective of the class. Plaintiffs' claims are dismissed with prejudice; however the Court will retain jurisdiction over this matter to ensure compliance with the terms of the Consent Decree.

SO ORDERED.

---

**8.** Out of 417 members who were sent notices, 180 responded to the poll. Of those who responded, 100 favored approval, 79 opposed, and one expressed indifference.