607 F.Supp. 1491 (1984)
In re NEW MEXICO NATURAL GAS ANTITRUST LITIGATION.
Sheila BREWER, Mark Fleisher, Ramon Huerta, Marie Loague, Jay Miller, Vodene Patterson, and Eliu E. Romero, on behalf of themselves and others similarly situated, Plaintiffs,
v.
SOUTHERN UNION COMPANY and Southern Union Gathering Company, Defendants.
Civ. A. No. 83-F-1173 (MDL-403).
United States District Court, D. Colorado.
August 1, 1984.
*1492 J.E. Gallegos, Arturo L. Jaramillo, Steven Tucker, Jones, Gallegos, Snead & Wertheim, Santa Fe, N.M., for plaintiff in the Brewer and State Cases.
Russell Moore, Keleher & McLeod, Albuquerque, N.M., for plaintiff Public Service Co. of New Mexico.
Robert F. Hill, Hill & Robbins, Denver, Colo., for all plaintiffs.
Robert F. Hanley, Kenneth Fimberg, Melanie Vogl, Morrison & Foerster, Denver, Colo., James Brosnahan, Thomas Lee, Cedric Chao, Morrison & Foerster, San Francisco, Cal., Victor R. Ortega, Montgomery & Andrews, Santa Fe, N.M., Hal Sanders, Strasburger & Price, Dallas, Tex., Walter A. Steele, White & Steele, Denver, Colo., for Southern Union defendants.

ORDER NO. 1984-32
APPROVING STIPULATION AND AGREEMENT OF SETTLEMENT OF CLAIMS BETWEEN PLAINTIFF CLASS MEMBERS AND DEFENDANTS SOUTHERN UNION COMPANY AND SOUTHERN UNION GATHERING COMPANY

AND
DISMISSING PLAINTIFF CLASS MEMBERS' CLAIMS WITH PREJUDICE AGAINST DEFENDANTS SOUTHERN UNION COMPANY AND SOUTHERN UNION GATHERING COMPANY AND ENTRY OF FINAL JUDGMENT
SHERMAN G. FINESILVER, Chief Judge.
In this class action the matter is before the court on a Joint Motion for Court Approval of Final Settlement by Class Action Plaintiffs (the "Brewer class") and defendants Southern Union Company and Southern Union Gathering Company (collectively "Southern Union").
The Stipulation and Agreement between the Brewer class and Southern Union dated April 12, 1984 is a comprehensive agreement contemplating the final resolution and dismissal of all cases which have been consolidated in this single action.[1] The cases involved are: Sheila Brewer, et al. v. Southern Union, et al., (Colo.Civ. No. 83-F-1173); State of New Mexico, ex rel. Department of Finance and Administration, et al. v. Southern Union, et al., (Colo.Civ. No. 83-F-1174); and Public Service Company of New Mexico v. Southern Union, et al., (Colo.Civ. No. 83-F-1175). Because of the nature of the proposed settlement, representatives of the Public Service Company of New Mexico ("PNM") and the State of New Mexico plaintiffs ("State plaintiffs") have also been signatories to the stipulation and agreement on behalf of those additional plaintiffs.

SUMMARY OF ORDER
The litigation involves claims of price fixing in regard to the wellhead price for natural gas produced in the San Juan Basin region of New Mexico. The complaints assert violations of section one of the Sherman Act, 15 U.S.C. § 1. The plaintiffs include a group of some 350,000 past and present residential consumers of natural gas residing in the State of New Mexico. This group has been certified as a class under the provisions of Rule 23 of the Fed.R.Civ.Proc. (F.R.C.P.).
The plaintiffs, including the plaintiff class, and the remaining defendants have reached a proposed settlement which would *1493 resolve all claims and terminate the litigation. Because of the involvement of a certified class, the court must approve any settlement as to the class under Rule 23(e) of the F.R.C.P. On April 20, 1984, the court gave preliminary approval to the settlement proposal. On June 29, 1984 the court held a hearing to consider final approval of the proposed settlement.
In this order we review the history of the litigation, the terms of the proposed settlement, the adequacy of the notice procedure, and the evidence presented in favor of and in opposition to the settlement. Thereafter, having concluded that the settlement is fair, adequate and reasonable to the class as a whole, the order GRANTS final approval pursuant to Rule 23(e) of the F.R.C.P.

INTRODUCTION
On April 17, 1984 the court conducted a hearing to determine whether the proposed settlement should be given preliminary approval under Rule 23(e) of the F.R.C.P. On April 20, 1984 the court entered Order No. 1984-21 which granted preliminary approval and directed that the class members be notified of the nature and terms of the proposed settlement.[2]
On June 29, 1984 a hearing was held at the United States Courthouse, Santa Fe, New Mexico, to determine whether the proposed Stipulation and Agreement should be given final court approval.
Appearing at the Final Approval Hearing on behalf of the Brewer class were the attorneys of record, Messrs. J.E. Gallegos, Arturo L. Jaramillo, Robert F. Hill and Stephen L. Tucker. Five of the named class representatives were also present at the hearing, those being Ms. Sheila Brewer, Mrs. Marie Loague and Messrs. Ramon Huerta, Mark Fleisher and Eliu Romero.
Appearing on behalf of the state plaintiffs were their attorneys of record, the same counsel as set forth above for the Brewer class. In addition, representing the interests of the state plaintiffs and present at the hearing was Mr. John Perovich, President of the University of New Mexico.
Appearing on behalf of the Public Service Company of New Mexico was its counsel of record, Mr. Russell Moore. In addition, Mr. A.J. Robison, Senior Vice-President of PNM and Mr. John Ackerman, also a Senior Vice-President of PNM, were present at the June 29, 1984 hearing.
The Southern Union defendants were represented by their counsel of record, Messrs. James J. Brosnahan, Robert F. Hanley, Cedric C. Chao, Kenneth R. Fimberg and Ms. Melanie Vogl. In addition, Thomas B. Morton, Senior Vice-President and General Counsel for the Southern Union defendants was also present at the Final Approval Hearing.
The court has reviewed the procedures used to notify class members of the terms of the proposed settlement, the final petition for attorneys fees and the time and place scheduled for the Final Approval Hearing.[3] The notification procedures appear to be adequate under the law and are discussed below.
Statements by counsel were presented concerning the merits of the proposed settlement and the nature of the negotiations that preceded the signing of the Stipulation and Agreement. J.E. Gallegos, Esq. testified as to the objectives of the plaintiffs in this litigation, the terms of the settlement as they relate to those objectives, and the nature of the negotiations that led up to the settlement. Mr. George L. Donkin, plaintiffs' principal damage expert and the five class representatives also testified. In addition, Mr. Joseph Ventura testified concerning the benefits of the proposed settlement to senior citizens residing in the Santa Fe area as well as in the State of New Mexico as a whole.
Messrs. Robison and Ackerman testified on behalf of PNM concerning PNM's affirmative *1494 position regarding the proposed settlement and negotiations leading up to the settlement. Each described the financial aspects of the settlement as well as the nature of the corporate structure of PNM that will be effectuated if court approval of the settlement is granted.
The only witness presented on behalf of the defendants was Mr. Morton. He discussed the benefits of the settlement to all parties as well as the hard fought nature of the negotiations that took place in the months preceding the settlement.
Lastly, four (4) individuals presented statements in opposition to the terms of the proposed settlement. They were Messrs. Frank Chavez, Don Hancock, Frank Benavidez and Jeffrey Smedberg. Generally speaking, the objections were all based on the portion of the settlement whereby PNM would acquire the natural gas production, distribution assets and facilities of Southern Union located in New Mexico.
Being thoroughly advised on this matter, we enter our findings of fact and conclusions of law under Rule 52(a) of the F.R. C.P. and pursuant to Rule 23(e) of the F.R.C.P. Accordingly, we GRANT final approval to the settlement as proposed in the Stipulation and Agreement entered into between the Brewer class and Southern Union defendants as well as the Agreement between Plaintiffs concerning Final Settlement signed on April 12, 1984.

I. HISTORY OF LITIGATION
This litigation has one of the more unique legal and factual histories encountered by the court in class action litigation. The cases have their genesis in substantial rate increases encountered by residential natural gas consumers in New Mexico. Sometime between 1976 and 1978 public school teachers in various locations within New Mexico noticed that, while school budgets increased yearly, little of the increases was applied towards higher teacher salaries. Instead a large portion of each increase was expended to pay increasing natural gas bills incurred to heat and cool the schools. At the same time, the same educators realized that their own residential natural gas bills had begun to increase substantially.
Alarmed by the apparent suddenness of these increases both at school and at home, the teachers, through an organizational body, the National Education Association  New Mexico ("NEA-NM"), contacted the Association's legal counsel and asked that an investigation be commenced into the cause and legitimacy of the sudden and sharp increase in natural gas prices.
It appears that counsel for NEA-NM spent much of 1978 investigating the reasons behind the natural gas price increase imposed by Southern Union's gas supply subsidiary, Gas Company of New Mexico. Based on the results of the investigation, counsel for the teachers' organization determined that the evidence revealed potential violations of section one of the Sherman Act, 15 U.S.C. § 1. Specifically, counsel believed that a scheme existed to fix wellhead natural gas prices at an artificially high level. This involved gas produced from the San Juan Basin located in New Mexico. The resulting higher prices were passed on to residential gas consumers through cost of gas increases allowed Southern Union by the New Mexico Public Service Commission. The parties to the conspiracy were alleged to be Southern Union, acting as both a wholesale buyer of natural gas and as a natural gas producer, and a significant number of the over 100 natural gas producers operating within the San Juan Basin. The alleged conspiracy or agreement was complicated by earlier litigation in the New Mexico state courts over the applicability of the concept known as "vintaging" to intrastate sales of natural gas. It was plaintiffs' contention that either (a) the state court litigation was a part of the overall price fixing scheme or (b) the settlement of that litigation itself amounted to an agreement to fix prices on the part of Southern Union and the San Juan natural gas producers.[4]
*1495 The NEA-NM and its counsel ultimately decided to file a consumer class action lawsuit against Southern Union and certain San Juan Basin Gas Producers. This course of action was considered the appropriate vehicle for vindicating the rights of all those victimized by the alleged price fixing conspiracy. In July 1979 the Brewer case was filed by eight representative class members in the United States District Court for the District of New Mexico.
Shortly after the filing of the Brewer class action discussions were commenced between counsel for the Brewer class and representatives of the State of New Mexico. The discussions focused on the potential impact of the alleged price fixing scheme upon various state agencies and state educational bodies as consumers of natural gas. These discussions resulted in several agreements by which counsel for the Brewer class were appointed to represent the various state agencies in a similar action against the same defendants. That separate action was filed in September of 1979.
In September of 1979 Southern Union filed a motion before the Judicial Panel on Multidistrict Litigation under 28 U.S.C. § 1407 to have the Brewer and State cases consolidated for pretrial proceedings with two similar cases pending in the Northern District of Texas.[5] After extensive briefing and oral argument the four cases were consolidated and assigned to the Honorable Howard Bratton, Chief Judge for the U.S. District Court for the District of New Mexico, In Re New Mexico Natural Gas Antitrust Litigation, 482 F.Supp. 333 (Jud.Pan. Mult.Lit.1979).
In January of 1980, however, Chief Judge Bratton, acting sua sponte, recused himself on the basis of a potential benefit to him should the plaintiffs succeed in their claims against the named defendants. This decision was appealed and on May 5, 1980, while commending Chief Judge Bratton for his integrity, the Court of Appeals for the Tenth Circuit reversed the recusal order holding Judge Bratton's potential benefit too inconsequential and insufficient to warrant such action, In Re Natural Gas Antitrust Litigation, 620 F.2d 794 (10th Cir. 1980).
Thereafter, Judge Bratton established a comprehensive discovery schedule on class certification and liability issues. The rest of 1980 was devoted to completing discovery and resolving numerous discovery disputes that arose during this time period.
In 1980 and early 1981 briefing and oral argument was completed on motions filed by defendants opposing class certification. On January 27, 1981, Judge Bratton entered orders certifying the putative class under Rule 23 of the F.R.C.P. We note that the case was more than a year and a half old and had undergone three rounds of substantial and extensive pretrial briefing and argument on three separate and significant legal issues.
In June of 1981, PNM joined in the litigation filing a complaint roughly paralleling those filed by the Brewer and State plaintiffs. In November of 1981 the defendants filed dispositive motions for summary judgment under Rule 56 of the F.R.C.P. accompanied by voluminous briefs, affidavits and statements of undisputed facts. Dispositive motions and supporting documents were also filed by plaintiffs in late 1981. These motions presented numerous unique legal issues premised on a fact pattern dissimilar to other complex antitrust litigation. These issues included matters pertaining to existence of a violation of 15 U.S.C. § 1 as well as questions regarding the applicability of certain affirmative defenses should evidence of a violation be established. Trial was scheduled for February 2, 1982.
On January 26, 1982, Judge Bratton entered an extensive order holding that the *1496 facts alleged in the complaint would support a claim of price fixing in violation of 15 U.S.C. § 1. The court rejected most of defendants' affirmative defenses to liability. The court also rejected plaintiffs' argument that they had established a violation of 15 U.S.C. § 1 as a matter of law. The court left open the question whether the facts would support a per se violation of 15 U.S.C. § 1 or whether the case should be analyzed under the "rule of reason" approach.[6]
In February of 1982 trial commenced on liability issues only. In late March the jury returned a verdict in favor of plaintiffs and against all defendants on all liability issues. Shortly thereafter the defendants filed several post-trial motions as well as motions for recusal of Chief Judge Bratton.
In May of 1982 Judge Bratton recused himself and the matter was assigned to Judge David K. Winder of the U.S. District Court for the District of Utah. The defendants filed additional motions including motions to set aside all prior rulings by Judge Bratton and a motion to vacate the liability verdict due to jury irregularities. Judge Winder found that certain conduct on the part of one of the jurors in answering voir dire questions required that the verdict be set aside and the case retried.[7] Judge Winder rejected defendants' argument that Judge Bratton's recusal required that all prior orders also be vacated.
In April of 1983, Judge Winder transferred the case to the District of Colorado for trial, and recused himself. On July 1, 1983 the litigation was assigned to this Court and several months later a trial date on both liability and damages issues was set for April 9, 1984. On January 6, 1984, the court ruled on all outstanding motions for summary judgment.
During January and February of 1984, the parties briefed and argued extensive dispositive motions on damage issues. Having reviewed and researched these motions, the court was nearing a ruling when the parties announced that a settlement of the case in principle had been reached.
On April 20, 1984, following an earlier hearing, an order entered granting preliminary approval to the settlement. This brought the case to a tentative end nearly five years after the first complaint had been filed.

II. PRIOR SETTLEMENTS
At various times during the course of this litigation, all the named defendants, other than the Southern Union entities, arrived at settlements with the plaintiffs. The first came in July of 1981 when defendant Supron settled with all plaintiffs for a total amount to the Brewer class of $3,230,000.[8]
In September of 1981, the plaintiffs arrived at a settlement with defendant Southland Royalty Company. The Brewer class received $8,380,000 as a result of this settlement.[9]
In September of 1983, the plaintiffs reached tentative settlements with defendants Conoco, Inc. and Consolidated Oil & Gas, Inc. In an order dated January 11, 1984, this court granted final approval to these two settlements.[10] As result, the Brewer class received the sum of $29,250,000 from Conoco, Inc. and $1,345,000 from defendant Consolidated Oil & Gas, Inc. Settlements to the Brewer class totaled $42,205,000.
*1497 At this point, the Southern Union entities remained as the sole defendants.

III. APPLICABLE STANDARD OF REVIEW
Rule 23(e) of the Federal Rules of Civil Procedure provides that no class action may be dismissed or settled without prior approval of the court. The standard of review to be utilized in determining whether a proposed settlement should be approved has developed through the case law. A class action settlement must be found to be fair, adequate and reasonable to the class as a whole in order to gain the approval of the court, In Re King Resources Co. Securities Litigation, 420 F.Supp. 610 (D.Colo.1976); Oppenlander v. Standard Oil Company (Indiana), 64 F.R.D. 597 (D.Colo.1974); See also, In Re Corrugated Container Antitrust Litigation, 643 F.2d 195, 207 (5th Cir.1981); Officers for Justice v. Civil Service Commission of the City and County of San Francisco, 688 F.2d 615 (9th Cir.1982).
This determination involves a balancing of a variety of factors which generally include: predictability as to outcome of the litigation; the strength of the plaintiffs' case; pivotal questions on liability and damages; expense, complexity and duration of further litigation; risk of maintaining class action status throughout the proceedings; amount of the proposed settlement; status of the case at the time of settlement; views and experience of counsel; positions of the litigants as to settlement; the range of possible recovery; whether the law involved is settled or in a meandering unresolved posture; and the character and scope of the negotiations that resulted in the settlement, See, In Re Corrugated Container Antitrust Litigation, supra; Officers for Justice, supra, at 625; Malchman v. Davis, 706 F.2d 426, 433-434 (2d Cir.1983); Reed v. General Motors Corp., 703 F.2d 170 (5th Cir.1983).
As the Ninth Circuit Court of Appeals has stated:
... the court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole is fair, reasonable and adequate to all concerned. Therefore, the settlement or fairness hearing is not to be turned into a trial or rehearsal for trial on the merits.... The proposed settlement is not to be judged against hypothetical or speculative measure of what might have been achieved by the negotiators.
Officers for Justice, supra, at 625. The primary concern addressed by Rule 23(e) is the protection of class members whose rights may not have been given adequate consideration during the settlement negotiations, Collins v. Thompson, 679 F.2d 168, 172 (9th Cir.1982); Simer v. Rios, 661 F.2d 655, 664 (7th Cir.1981); Grunin v. Intl. House of Pancakes, 513 F.2d 114, 123 (8th Cir.) cert. denied, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975). With these general guidelines in mind we turn to a review of the proposed settlement between the Brewer class and the Southern Union defendants.

IV. TERMS OF PROPOSED SETTLEMENT
On April 12, 1984 the parties informed the court that the representatives of the Brewer class, the State plaintiffs, PNM, and Southern Union had reached a settlement of their dispute which would, if approved, eliminate the need for a trial. The Stipulation and Agreement entered into by the parties encompasses a comprehensive final settlement of all actions consolidated in this litigation.[11]
The essential format of the proposed settlement centers around the purchase by the plaintiff PNM of certain New Mexico gas utility properties and assets owned by defendant *1498 Southern Union.[12] As part of the settlement consideration, the purchase price of these assets is reduced by Fifty-one Million Five Hundred Thousand Dollars ($51,500,000) from the book value of the assets.
In other words, PNM is purchasing the New Mexico assets of Southern Union for a purchase price that is reduced by $51,500,000. The latter figure represents part of the negotiated settlement. Another part of the settlement is the direct cash payment to be made to the Brewer class by the PNM plaintiffs.
In accordance with the agreement between the plaintiff PNM, the Brewer class plaintiffs and the State of New Mexico plaintiffs, PNM shall pay to the Brewer plaintiffs a total of Thirty-Two Million Six Hundred Thousand Dollars ($32,600,000) as follows: an initial cash payment of Twelve Million Six Hundred Thousand Dollars ($12,600,000) upon final approval by the court of the proposed settlement and a subsequent payment, due on or before January 2, 1986, of Twenty Million Dollars ($20,000,000), together with interest at the rate of 8% per annum. In addition, PNM shall pay to the State plaintiffs, upon final court approval of the proposed settlement, the sum of Two Million Three Hundred Thousand Dollars ($2,300,000).[13]
There is an additional settlement consideration. Integral to the structure of the proposed settlement is a plan and program for the renegotiation of Southern Union's San Juan Basin gas purchase contracts with gas producers. The objective of the renegotiation program is to accomplish the best and earliest practicable reduction of natural gas costs to New Mexico residential consumers. Upon application for administrative approval of the gas utility transfer by the appropriate regulatory authorities in New Mexico, PNM has agreed to undertake such a renegotiation program. Southern Union has also agreed to provide reasonable assistance and cooperation in connection with the renegotiation program (See, Article 7.3 of the Purchase and Sale Agreement dated April 12, 1984).
The Stipulation and Agreement of the parties also provides that PNM will pay the sum of $750,000 to the plaintiff class, and the State of New Mexico plaintiffs, for reimbursement of essential litigation expenses. Moreover, Southern Union has agreed to reimburse the plaintiff class for up to $100,000 of their actual out-of-pocket costs in providing notice of the proposed settlement to members of the class.
Consummation of the proposed settlement as outlined above is contingent upon (a) the closing of the Purchase and Sale Agreement between PNM and Southern Union; (b) approval by regulatory state and federal bodies; and (c) approval by Southern Union shareholders.[14]

V. DEFINITION OF THE CLASS
As initially certified the class was defined as
... those persons who are residential consumers of natural gas situated in those geographic areas of the State of New Mexico which are within the service areas of Southern Union, and who purchased natural gas from Southern Union through a single meter for a single family residential unit, and who were classified by Southern Union as "residential" customers at any time between June 30, 1976 and February 28, 1981.
*1499 See, Class Certification Order dated January 27, 1981. In Order No. 1984-20, dated April 20, 1984 this court granted a joint motion to enlarge and redefine the certified class. As a result of that order the class is now defined as
... those persons who are (or were) residential consumers of natural gas situated in those geographic areas of the State of New Mexico which are within the service areas of Southern Union and who purchased natural gas from Southern Union through a single meter for a single family residential unit, and who were classified by Southern Union as "residential" customers, at any time between June 30, 1976 and April 12, 1984.
Due to this change the class was enlarged from approximately 300,000 members to approximately 350,000 members. The Brewer action involves a single class with no sub-classes.

VI. ADEQUACY OF NOTICE TO CLASS
Because of the redefinition and enlargement of the class, discussed above, and because the court, by Order No. 1984-22, allowed potential class members who had previously excluded themselves from the class an opportunity to reinstate their membership, the notice procedures were necessarily more complex and broader than in previous settlements.
As described in Order No. 1984-21 granting preliminary approval to the proposed settlement three separate notices were to be mailed and a fourth published in 17 newspapers circulated within the State of New Mexico. One notice form was mailed to existing class members. A second form was mailed to new class members advising them of the settlement and giving them the opportunity to exclude themselves from class membership. A third form was mailed to those who had intentionally or unintentionally excluded themselves in the past providing an opportunity to rejoin the class. Finally, a fourth notice form was published encompassing relevant portions of the three mailed forms to reach those class members or excludees for whom valid addresses could not be acquired. The four separate notice forms were specifically approved by the court in Order No. 1984-25 dated May 2, 1984.
These notices provided a summary of relevant settlement terms and the contents of the final petition for award of attorney's fees. Methods to present comments and/or objections to the terms of the proposed settlements were also detailed.
Individual notices by mail of these matters were provided to all active class members in June 1984. In addition, the required form of notice was published prior to June 1, 1984 in 17 newspapers located throughout New Mexico.
At the Final Approval Hearing a written report concerning the procedures which were utilized to provide individual and published notice to active and inactive class members was admitted into evidence.[15] The report establishes that adequate notice was timely and sufficiently given to class members in full compliance with Rule 23(e) of the F.R.C.P. and in the manner directed by Order No. 1984-21.
The court finds that class members have been duly, sufficiently and fairly notified of (1) the terms of the Stipulation and Agreement; (2) the nature of the final petition for award of attorneys' fees; (3) the date, time and place of the Final Approval Hearing and (4) the procedure for bringing comments and/or objections concerning the settlement to the attention of the court. The notice procedure set out in Order No. 1984-21 and the forms of notice approved by Order No. 1984-25 provided the class with full, fair and adequate notice, satisfied the requirements of Rule 23(e) of the F.R.C.P. and complied with all applicable due process and other constitutional requirements.

VII. EVIDENCE AND TESTIMONY CONCERNING PROPOSED SETTLEMENT
The court conducted an evidentiary hearing as to the merits of the proposed settlement *1500 on June 29, 1984 in Santa Fe, New Mexico. We have considered testimony presented at the hearing and all exhibits introduced into evidence. We have also considered the testimony and documentary evidence presented at the preliminary approval hearing held on April 17, 1984. Judicial notice was taken of all papers and pleadings, trial and discovery exhibits and deposition testimony filed with the court in this protracted litigation. We outline pertinent testimony.

TESTIMONY IN FAVOR OF PROPOSED SETTLEMENT
1) J.E. Gallegos, Esq.:
Mr. Gallegos was the first witness to testify in favor of the proposed settlement. Mr. Gallegos has been lead counsel for the Brewer and State plaintiffs since the inception of the lawsuit. Mr. Gallegos provided a brief history of the litigation and discussed at length the negotiations that resulted in the proposed settlement. Mr. Gallegos minutely detailed the protracted and hard fought nature of the negotiations spanning the time between the fall of 1982 through most of March 1984.
Mr. Gallegos listed the objectives that the plaintiffs hoped to achieve through trial or negotiated settlement and how failure to achieve the objectives was an initial stumbling block to settlement. As described by Mr. Gallegos these litigation goals were (1) reimbursement of all overcharges paid as a result of the alleged price fixing agreement; (2) the development of a mechanism or procedure to obtain the reduction of natural gas prices stemming from the gas supply contracts that formed the basis for the price fixing scheme; and (3) the transfer of the Southern Union gas utility in New Mexico to the ownership of those with the economic motivation to serve New Mexico residents fairly and efficiently.
Mr. Gallegos related his firm belief that the proposed settlement fully satisfied these objectives. He emphasized that total settlements amounted to 80% to 100% of the asserted overcharges based on plaintiffs' damage studies; the Stipulation and Agreement creates a mechanism by which PNM and counsel for the Brewer class would commence renegotiations of all natural gas purchase contracts between Southern Union and San Juan Basin producers; and the acquisition of the Southern Union gas utility by PNM places New Mexico gas supply services in the control of an entity with closer ties to the interests of the State of New Mexico. Mr. Gallegos stated that these goals might not have been achieved had the case proceeded to trial.
Lastly, Mr. Gallegos discussed the risks inherent in continuing the litigation. These included the usual risks associated with any jury trial; continuing doubt over the ultimate outcome of numerous disputes on a variety of legal issues that might be raised in subsequent appeals; the risk of intervening changes in the law; uncertainty surrounding pending damage motions; and the risk that either the jury might reject plaintiffs' damage estimates entirely or that any damages awarded, even when trebled, might only result in negligible damages assessed on Southern Union.
Taking all these factors into consideration, Mr. Gallegos strongly recommended that the proposed settlement be approved.
2) Mr. George Donkin:
Mr. Donkin has been plaintiffs' primary damage expert throughout the course of this litigation. He testified concerning alternative calculations of the damages allegedly suffered by the Brewer class. Under the two principal alternate damage studies, the single damages stemming from the alleged price fixing agreement could range from a low of $70 million to a high figure in excess of $95 million. In contrast, the total settlement amount to be paid to the Brewer class from all past and proposed settlements is $74.8 million. According to Mr. Donkin's estimates this represents a recovery of between 79% and 108% of all single damages incurred by the Brewer class.[16]
*1501 Mr. Donkin also discussed the competing damages studies prepared by defendants' experts. While he believed them to be in error, Mr. Donkin acknowledged that, if presented to the jury and accepted, the result might be a substantially lower judgment on behalf of the plaintiff class. Mr. Donkin also agreed with the court's observation that the damage studies were all complex and would be difficult to explain to a lay jury. Therefore the issue of damages would be, to a great extent, a battle of experts with inherently unpredictable results.
Finally, Mr. Donkin compared the monetary results achieved in this case with other antitrust lawsuits in which he had been involved.[17] In no other case had the plaintiffs come as close to 100% recovery of their estimated single damages. Mr. Donkin strongly advocated approval of the proposed settlement from his viewpoint as plaintiffs' principal damage expert.
3) Mr. A.J. Robison; and
4) Mr. John Ackerman:
These witnesses are both senior vice-presidents of plaintiff PNM. Mr. Robison is chief financial officer of the utility. Mr. Ackerman has been assigned to oversee the transfer of the gas utility to PNM as well as its subsequent operation when and if judicial and administrative approval is forthcoming.
Mr. Robison described the terms of the proposed acquisition including the related provisions for PNM to pay the Brewer class $32.6 million as the class share. This sum represents the reduction in book value of Southern Union assets and constitutes defendants' monetary portion of the settlement. He also testified to the financial benefits that the acquisition would provide to PNM and PNM customers and he outlined the history of PNM's involvement in the litigation.
Mr. Ackerman described the mechanics of merging the gas utility into the corporate structure of PNM. He detailed in his testimony the methods by which PNM would maintain the two alternative energy sources, i.e., gas and electricity, on a competitive basis and avoid conflicts of interest in their operation. He emphasized that while PNM would utilize available economies of scale where appropriate, PNM was also committed to the idea of providing electricity and gas at low costs maintained by competition between the two alternative energy sources.
Both witnesses testified that transfer to PNM provided a real opportunity to roll back gas prices currently being paid by New Mexico residential consumers. They both recommended approval of the settlement.
5) Mr. Joe Ventura:
Mr. Ventura is a resident of the Santa Fe area of New Mexico. A retired railroad employee active in senior citizen affairs, Mr. Ventura testified concerning the difficulties New Mexico senior citizens encounter living on fixed incomes with rising utility bills. He discussed the benefits to senior citizens that would result from the anticipated rebate of settlement funds to Gas Company of New Mexico customers. Mr. Ventura stated that he was familiar with the terms of the settlement, that he recommended approval of the settlement and that all senior citizens that he had contacted were also in favor of settlement.
6) Mrs. Sheila Brewer (School Teacher; Gallup, New Mexico)
7) Mr. Ramon Huerta (School Teacher; Albuquerque, New Mexico)
8) Mr. Mark Fleisher (Realtor; Albuquerque, New Mexico)
9) Ms. Marie Loague (School Teacher; Farmington, New Mexico)
10) Mr. Eliu E. Romero (Attorney; Taos, New Mexico)
These five individuals are the named class representatives present at the Final *1502 Approval Hearing.[18] Each testified or commented upon the proposed settlement. Further, the settlement achieved substantially all of the objectives of the litigation.
The class representatives highlighted the risks that would exist if the case proceeded to trial. All were familiar with the details of the proposed settlement. It was apparent that these witnesses had an exceptional grasp of the details of the litigation. Under questioning by counsel and the court, each unequivocally recommended approval of the settlement. Finally, each stated that in discussions with other class members no objections were voiced once all the relevant terms and conditions were explained.
11) James Brosnahan, Esq.:
Since late October of 1983 Mr. Brosnahan has been one of the principal lawyers for the Southern Union defendants. Highly experienced in antitrust and complex litigation, Mr. Brosnahan exhibited a thorough understanding of the instant litigation. From the record statements of opposing counsel and testimony it is apparent that Mr. Brosnahan played an instrumental role in negotiations leading up to the proposed settlement.
At the hearing Mr. Brosnahan emphasized that the settlement represented a unique business transaction providing benefits to all parties and that all parties had made realistic concessions to achieve these concrete benefits. He stated that, from Southern Union's standpoint, the settlement provided it with an opportunity to sell assets that had proved troublesome as well as an opportunity to fairly terminate a costly and risk-filled lawsuit. He reiterated the comments of Mr. Gallegos concerning the uncertainties of trial as well as protracted appellate proceedings.
Mr. Brosnahan detailed the nature and character of the settlement negotiations. His comments left no doubt that, from his position, the negotiations were at all times hard fought and carried on at arms length. He recommended approval of the settlement.
12) Thomas Morton, Esq.:
Mr. Morton is a senior vice president and general counsel for the Southern Union defendants. He has been Southern Union's representative at all hearings held before this court. Mr. Morton echoed the statements of Mr. Brosnahan. He stated that the settlement allowed Southern Union to extricate itself from the lawsuit at an acceptable and fair cost given the financial risks presented. He also testified that the negotiations were at all times extremely hard fought, each side zealously represented by respective counsel. He recommended approval of the settlement without reservation.

OBJECTIONS AND TESTIMONY IN OPPOSITION TO THE PROPOSED SETTLEMENT
Ten written or oral objections to the proposed settlement were received by the court prior to the June 29, 1984 Final Approval Hearing.[19] Of the ten objectors, four appeared at the Final Approval Hearing to present testimony in opposition to approval of the proposed settlement.
Generally speaking the relatively few objections fall into five distinct categories. Seven of the objectors oppose the acquisition of Southern Union's gas supply utility by PNM fearing increased power PNM will gain as the sole supplier of gas and electricity in the areas serviced.
Others complain that the interest rate to be paid by PNM to the Brewer class on the money owed by PNM is too low. Under the terms of the agreement PNM will pay an interest rate of 8% on all funds owed to the Brewer class and payable over the next two years. The objectors contend that the rate of interest should be at an appropriate market rate.
*1503 Several of the objectors also argue that the terms of the proposed settlement unduly favor either Southern Union or PNM shareholders. As to Southern Union, these objectors contend that too much is being paid by PNM for assets of questionable market value.
In regard to PNM, the objectors assert that the utility is not returning a sufficient portion of the benefits it has received or anticipates receiving as a result of the settlement with Southern Union to its customers. In addition, these objectors maintain that PNM should be required to rebate these benefits to customers over a shorter time period than currently planned.
One objector maintains that the monetary amount of the settlement is insufficient. Given the potential damages to all plaintiffs of $123.4 million, trebled to $370 million, the settlement with Southern Union amounts to only a 13% return of potential damages. This objector believes that this amount is not adequate.
Finally, an objection has been raised based on environmental concerns. The contention is that PNM will reduce the availability of natural gas, encouraging greater use of electricity thereby justifying construction of additional electrical generation facilities burning fuels (coal) harmful to the environment.
We outline the testimony of four objectors who testified at the hearing.
1) Mr. Frank Chavez:
Mr. Chavez is a former New Mexico state representative. He testified that the monetary terms of the proposed settlement appeared to be fair and adequate. His only objection related to the acquisition of Southern Union's gas utility assets by PNM. Mr. Chavez stated that he feared the monopoly power that would be provided to PNM by the proposed acquisition. He also testified that PNM, did not have real ties to the State of New Mexico, a majority of its shareholders being non-residents.
2) Mr. Don Hancock:
Mr. Hancock is employed by various charitable organizations in the Albuquerque, New Mexico area. At the hearing he testified that he was not opposed to the monetary amount of the settlement with the Brewer class, nor did he object to the proposed plan to rebate the Brewer settlement fund to the class members.
Instead, like Mr. Chavez, Mr. Hancock objected to the PNM/Southern Union acquisition. Mr. Hancock also expressed strong doubts as to the ability or desire of PNM to operate the gas utility free of collusion with the electrical utility segment. Finally, Mr. Hancock stated that any settlement should invalidate the natural gas purchase contracts which have been the source of the alleged overcharges. He suggested that the litigation should go forward.
3) Mr. Frank Benavidez:
Mr. Benavidez in his testimony inquired how PNM would rebate its share of the settlement to its customers. Mr. Robison, on behalf of PNM, responded that the rebate would take place and would be in the form of a reduction of the kilowatt hour rate charged to PNM customers. Mr. Benavidez expressed no opposition to this method. He also stated that the creation of a monopoly did not concern him as several monopolies (such as AT & T) had served him quite well in the past.
4) Mr. Jeffrey Smedberg:
Mr. Smedberg is a printer residing in Santa Fe, New Mexico. He also objected to the PNM-Southern Union acquisition. Mr. Smedberg stated his belief that allowing PNM to control electrical, gas and water supply to residential consumers obviated any benefit that the settlement otherwise conferred on the Brewer class and others.
Mr. Smedberg also expressed his view that PNM was not a New Mexico company, most of its shareholders residing elsewhere, and that PNM's actions in the past have not shown the utility to have the best interests of New Mexico at heart. Mr. Smedberg agreed with other objectors that *1504 any settlement should include the elimination of the natural gas purchase contracts which have been the origin of the alleged overcharges.

VIII. ANALYSIS OF THE PROPOSED SETTLEMENT UNDER APPLICABLE STANDARDS
As we have stated earlier, the question before the court is whether the settlement before us is fair, adequate and reasonable to the class as a whole, In Re King Resources Company, supra; Oppenlander, supra. A variety of factors may be considered and balanced in making this determination. These factors vary depending on the facts, circumstances and posture of the litigation in question, Malchman v. Davis, supra; Reed v. General Motors Corp., supra.
In the instant case it is our view that the factors which should be considered are as follows: The strength of the opposing positions; the risk of establishing damages at trial; the expense, complexity and likely duration of further litigation; the extent of discovery and the current posture of the case; the views and experience of counsel; the range of possible settlement; the character and scope of the negotiations that resulted in the settlement; and the reaction of class members to the proposed settlement. We now turn our attention to the factors listed.

1) Strength of Opposing Positions:
At the time that the proposed settlement was reached the case was less than four weeks from trial. Most legal issues regarding liability had been resolved with the only remaining substantive question being the applicability of the per se rule of liability to the facts presented. As to damages, however, the court had under consideration at the time of settlement a number of extremely novel and complex legal questions. The resolution of those issues would have substantially benefitted one party to the detriment of the unsuccessful movants. Our ruling would certainly have been an integral part of an inevitable appeal if the case had gone to trial.
On liability issues, based on previous rulings, the plaintiffs had a strong threshold case. By that we mean that the plaintiffs had succeeded in defeating defendants' summary judgment motions and were left to prove their case factually within the legal framework established by the court. However, the plaintiffs still had to concern themselves with the applicability of the per se rule of liability to the facts presented. This area of antitrust law is far from resolved. At the time the case settled the Supreme Court had not again utilized the rationale first set out in Broadcast Music Inc. v. CBS, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979) ("BMI"). Recently, however, the court has applied the BMI analysis to determine the applicability of the per se rule of liability National Collegiate Athletic Assoc. v. Board of Regents of the University of Oklahoma, ___ U.S. ___, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) ("NCAA").
The renewed vigor of the BMI rationale exhibited by the NCAA decision, in some quarters, suggests doubt as to the applicability of the per se rule in this case.[20]
*1505 Beyond that, the case remained to be decided on the facts, a substantial risk for all parties. Of course the plaintiffs' hopes were bolstered somewhat by the fact that a previous jury had found in their favor during the first liability trial that lasted several weeks.
As previously mentioned, the resolution of damage issues was very much in doubt at the time of settlement. The adjudication of these motions would have done much to determine the strength of the competing positions. Success on damages, then, remained an open question for all parties.
It can be said that at the time of settlement the case on liability appeared slightly more favorable to the plaintiffs simply by virtue of reaching the point of trial with a colorable claim for violation of section one of the Sherman Act, 15 U.S.C. § 1. Of course, it was anticipated that Southern Union would call fact and expert witnesses at trial supporting their theory of no liability. No one can predict whether a jury would have ultimately found in favor of the plaintiffs. Succinctly stated, the competing liability positions do not lend themselves to ready evaluation of relative strength. Liability remained a burning question.

2) The Risk of Establishing Damages:
As mentioned above, crucial damage motions were on the threshold of a ruling by the court, but remained unresolved at the time of settlement. Nevertheless, each side recognized certain risks that existed in establishing damages. We note that the damage calculations were complex and could not have been easily explained to a lay jury. In addition, as is commonly the case, a determination of damages would have involved a battle of opposing experts, each establishing an amount that might be accepted by the jury. The range of damages started at nothing and ran to a high in excess of $100 million dollars. The plaintiffs faced the possibility that the jury might select a figure that, when trebled, would amount to less than the sum of all previous settlements, requiring no payment by Southern Union. On the other hand, Southern Union risked a trebled judgment of more than $300 million; a judgment that might well have ruined the corporation as a viable business entity.

3) Expense, Complexity and Likely Duration of Further Litigation:
Obviously, an eight to ten week trial represented a substantial future cost to all litigants. The likelihood of appeal and perhaps a retrial only added to the potential future expense.
Many complex legal issues had already been resolved at the point settlement was reached. Many remained, especially in relation to damages. Further, the conduct of the trial would have presented the court and the litigants with a plethora of unique and complex evidentiary and procedural questions. Appeals would have triggered review of rulings and issues since the commencement of the litigation in 1979. These pivotal and potentially precedent setting rulings were entered by three separate federal judges, namely Judges Bratton, Winder and Finesilver.
Finally, the parties faced an eight to ten week trial. Appeal from any adverse verdict was likely and the appeal could take three years. In addition, the casepresented several issues that might have realistically resulted in a grant of certiorari by the Supreme Court. The litigation had a potentially long life ahead.

4) The Extent of Discovery and Current Posture of the Case:
At the time that settlement was reached the parties had completed discovery and were largely prepared for trial. Clearly, the case was in its best position development wise for the parties to intelligently discuss the merits and reach an informed decision on settlement based on inherent risks. From the point of view of the class, the case could not have been in a better posture to discuss settlement than it was immediately after the first liability verdict was returned. The parties understood as much about this case as they were going to before the actual trial commenced.

*1506 5) The Views and Experience of Counsel:
Principal counsel in this case have each expressed their firm belief that the court should approve the settlement as proposed. As noted, Mr. Brosnahan is an attorney with considerable experience in complex antitrust litigation.
While not having actual experience in complex antitrust litigation, Mr. Gallegos, class counsel, is the attorney primarily responsible for instituting the litigation and seeing it through to this settlement over a period of almost five years. During that time Mr. Gallegos, and other counsel for plaintiffs, have faced attorneys from some of the largest and most formidable law firms in the country. Mr. Gallegos proved to be a keen student of antitrust law. Many motions of substantial import have been filed by defendants and responded to by Messrs. J.E. Gallegos, Arturo L. Jaramillo and other counsel. Plaintiffs have successfully resisted many motions which might have ended the litigation. Simply put, over the years since 1979 Mr. Gallegos acquired the knowledge and experience to prosecute large class action antitrust litigation. We place great weight on his recommendation that the settlement be approved as we do in the practical business viewpoint of settlement expressed by Mr. Brosnahan.

6) The Range of Possible Settlement:
It is our view that the appropriate range of settlement should be based on the potential single damages incurred by plaintiffs. Treble damages under the antitrust laws are much like punitive damages in other civil litigation. Each is a penalty for grossly improper conduct. Therefore, as a general matter, settlement discussions should not begin with a figure that includes the penalty, as settlement represents an attempt to resolve the litigation without determining fault.
In this case, the potential single damages range from nothing to an amount slightly in excess of $100 million. The settlement reached with Southern Union, combined with previous settlements, represents a return of from 79% to 108% of the Brewer class total single damages. This is based on plaintiffs' own alternate damage studies. The representatives of the plaintiff class have repeatedly stated that one of their primary case objectives has been a return of the total overcharges paid by the class members. Clearly then, this amount falls within the range of possible settlement. Indeed, it is a settlement that, when combined with previous settlements represents nearly a full recovery of all damages suffered.
Examining the settlement from another viewpoint, we note that the monetary amount is greater than any previous settlement with other defendants. The plaintiffs received $50 million in settling with defendant Conoco, Inc. Of that, something slightly in excess of $29 million was allocated to the Brewer class. Here, in contrast, the plaintiffs are receiving $51.5 million of which $32.6 million has been allocated to the Brewer class; this from a corporation with substantially fewer assets than Conoco, Inc. In addition, other non-monetary benefits have been received by the Brewer class, benefits which plaintiffs believe are as important as the monetary return. By all calculations this settlement falls within the range of reasonable expectations.

7) Character and Scope of the Negotiations:
It is hard to convey to anyone who has not been involved in this litigation its complexity and depth. It is equally difficult to explain the range and scope of the negotiations that took place prior to settlement. But simply stated they were extensive and hard fought by all.
We are wholly satisfied that the negotiations took place at arms length. The court has observed plaintiffs counsels' conduct during several negotiation sessions that took place in the fall of 1983.[21] Plaintiffs' counsel at all times zealously and vigorously *1507 represented the interests of the plaintiff class. The court was impressed with the commitment exhibited by Mr. Gallegos and the other Brewer attorneys on behalf of the Brewer class and Mr. Russell Moore on behalf of PNM.
Much the same can be said of the conduct and professional responsibility and commitment of defense counsel, in particular Messrs. James Brosnahan and Robert F. Hanley. They, like plaintiffs' counsel, fully and vigorously defended and espoused the views taken by Southern Union's corporate representatives.
In summary, from our own observations and from the comments of counsel, we are completely satisfied that the negotiations fully aired all issues, risks, possibilities and contingencies and were conducted at arms length at all times.

8) Views of Class Members:
The Brewer class consists of some 350,000 past and present New Mexico residential natural gas consumers. Throughout much of this litigation the class has spoken through seven named representatives.
At the preliminary approval hearing held on April 17, 1984, each of the class representatives present spoke in favor of court approval of the proposed settlement. Again, at the Final Approval Hearing each class representative present strongly recommended that the court approve the settlement. None of the class representatives expressed reservations. Each described how the proposed settlement achieved the objectives set when the litigation was initiated.
We recognize that the class representatives are only a few individuals who belong to a group with 350,000 members. Nevertheless, they were initially selected and approved as representatives because it was believed that they would fairly represent and reflect the interests of the class as whole. In addition, they have attended nearly all court sessions.
Throughout the course of this court's involvement with this litigation we have noticed and been impressed by two characteristics common to each of the class representatives. Those are (1) their knowledge and understanding of this complex case and (2) their degree of commitment to achieving the greatest benefits for the class.
As representatives of the class these individuals have been responsible for gaining a thorough knowledge of the case so as to be able to keep other class members informed. They have also had to keep abreast of litigation that spanned five years before three different courts in Colorado, Utah and New Mexico.
By virtue of their degree of involvement and commitment, the opinions and recommendations of the class representatives are entitled to great weight in determining whether the settlement should be given court approval.
In addition to the views of the class representatives we must also take into consideration the general nature of the class response to the notices of settlement mailed or published following preliminary approval. To date the court has received fewer than twenty objections to all or parts of the tentative settlement. This represents a minuscule percentage of the total class membership. From this we can only assume that a vast majority of the class members have no substantial objection to the terms of the proposed settlement.
Lastly, we respond to the objections that have been raised by certain class members. A few have suggested that the monetary amount of the settlement is too low for approval. We reject this assertion. The settlement amount combined with previous settlements reflect a nearly complete recovery of plaintiffs' single damages based on plaintiffs' own calculations. All those familiar with this litigation recognize that establishing damages would have been one of the most difficult and problematic aspects of any trial on the merits. The plaintiffs might well have established liability, but failed to establish sufficient damages that, even after trebling, would have made trial a worthwhile exercise.
*1508 Further, the amount of the settlement must be compared to previous settlements with defendants who possess far greater assets than Southern Union. Specifically, Southern Union is paying plaintiffs an amount greater than that paid by Conoco, Inc. to settle the plaintiffs' claims against Conoco. Of course, this alone does not establish the sufficiency of the settlement amount. It is, however, a yardstick that may guide the court in determining the adequacy of the proposed settlement.
Finally, we must take into consideration the non-monetary benefits inuring to the class as a result of the settlement. These include the opportunity to have a greater voice in the operation of the gas supply utility and the right to assist in the renegotiation of the natural gas purchase contracts with the San Juan Basin producers.[22] We also cannot ignore the fact that class counsel and the class representatives feel that the settlement amount adequately compensates the class.
The objectors also contend that the terms of the settlement improperly favor the shareholders of PNM and Southern Union. Again, we cannot accept this analysis. Mr. Gallegos and other class counsel have vigorously represented and protected the rights of their clients throughout the course of this litigation. They have had access to all the information necessary to consider all the terms of the proposed settlement to assure that neither PNM nor Southern Union would unfairly benefit from the settlement at the expense of the plaintiff class.
As to the acquisition price being paid by PNM for Southern Union's gas supply utility, we can only presume that the two sides bargained until a price reflecting true value was derived. We have seen absolutely no evidence of any collusive conduct between Southern Union and PNM, nor is there any evidence that PNM paid too much for the assets acquired.
The objectors have presented one argument against approval that, at first glance, has some facial appeal. Several objectors argue that, by allowing the acquisition of Southern Union's gas utility by PNM, the settlement creates the potential for further anticompetitive conduct by an entity with substantial monopoly power over gas and electricity supply in New Mexico.
Our response to this is five-fold. First, we note that the Brewer class counsel and representatives have recommended approval of the settlement fully cognizant of the increased power and control placed in the hands of PNM. Clearly, they believe that (1) PNM will live up to its promises to keep electricity and gas supply operations separate and competitive; (2) they have the ability to monitor the activities of PNM to assure that PNM does not engage in activities resulting in unwarranted increases in gas and electricity prices and (3) the benefits of settlement outweigh any potential future risks. We place a great deal of reliance on the views of plaintiffs' counsel and those of informal and interested class representatives.
Second, it is our view that while PNM may not be owned by shareholders living in New Mexico, it is an entity which is much more dependent for its survival on the goodwill of New Mexico residents than is Southern Union. This suggests that New Mexico residents may well receive better treatment at the hands of PNM than from Southern Union's gas supply subsidiary, the Gas Company of New Mexico. PNM has a greater incentive to serve the residents of New Mexico fairly and efficiently. The corporate structure depends primarily on revenues generated within the State of New Mexico.
Third, we point out that through the New Mexico Public Service Commission ("NMPSC") the Brewer class members and other consumers have a vehicle to monitor and challenge the future price structure established by PNM. The objectors have questioned the ability and the desire of the NMPSC to conduct this review properly. We are of the view, however, that the *1509 settlement documents together with the statements made by PNM representatives at the Final Approval Hearing provide a framework within which to review PNM's future activities and to require PNM to live up to its promise to keep the gas and electric utilities separate and competitive. Substantial administrative and other mechanisms exist to maintain a check on future questionable activities by PNM, if any.
Fourth, it is clear to us that counsel for the Brewer class as well as some or all of the Brewer class representatives will remain involved in efforts to lower utility rates within New Mexico. Mr. Gallegos and the class will have a significant role in the negotiations between PNM and the natural gas producers in the efforts to achieve lower wellhead gas prices. Through this continued involvement with PNM, the Brewer class representatives will be able to maintain a watchful eye on prices charged for gas and electricity.
Fifth, we are not at all convinced that PNM will use the acquisition in question to achieve a stranglehold on the New Mexico electric and gas utilities with the intent to charge inflated prices. The court has been impressed in the past with the sincerity of the PNM representatives in their efforts to assist the Brewer class and the residents of New Mexico generally in achieving and maintaining fair rates for electricity and natural gas. Our impression was reinforced by the comments of Messrs. Robison and Ackerman at the Final Approval Hearing. They appear genuinely committed to many of the same goals expressed by the Brewer class representatives.
We are not suggesting that risks are not associated with this settlement. There is the possibility that PNM may use the acquisition of Gas Company of New Mexico to the detriment of New Mexico residents. Nevertheless, we believe that the actual and potential benefits of this settlement clearly outweigh the risks associated with the acquisition by PNM.[23]
Finally, several objectors question the interest rate to be paid by PNM on settlement funds owed to the Brewer class. Under the terms of the side agreement among PNM, the State plaintiffs and the Brewer class, PNM is to pay the class $20 million on or before January 2, 1986. Interest at 8% per annum is to accumulate until the principal is paid.
The 8% figure is of course below current market rates. However, as was explained by Messrs. Robison and Gallegos at the Final Approval Hearing, PNM is being allowed a lower interest rate because PNM is receiving slightly less than its proportionate share of the full settlement amount. The lower interest rate is intended to make up this shortfall. We find this explanation to be entirely satisfactory.

CONCLUSION
In summary, having considered all the testimony and evidence presented, we find the proposed settlement between the Brewer class and the Southern Union defendants to be a bona fide agreement benefiting all members of the class in a uniform, equitable and non-discriminatory fashion. The resolution of the "conspiracy", "impact", and "damage" issues is of sufficient uncertainty so as to justify the proposed compromise settlement.
The Stipulation and Agreement provides a substantial and assured recovery to members of the class, considering the many difficult and complex factual and legal issues which would otherwise remain to be resolved at trial.
During our review, we have taken into consideration the various objections raised by certain class members. It is our view that these objectives do not raise questions sufficient to justify rejection of the proposed settlement. The settlement is fair, adequate and reasonable and is in the best interests of the members of the plaintiff class.
*1510 In reaching this conclusion, the court has made no attempt to resolve the merits of the case or to reach an ultimate conclusion on any contested issues. The above constitute our findings of fact and conclusions of law in conformance with rule 52(a) of the F.R.C.P.

ORDER
Having carefully reviewed all the exhibits, documents and testimony, it is our view, based on the factors discussed, that the proposed settlement between the Brewer class and the Southern Union defendants and other presented agreements among all defendants are fair, adequate and reasonable and in the best interests of the class as a whole. Accordingly, the agreements are APPROVED in conformance with Rule 23(e) of the Federal Rules of Civil Procedure.
IT IS THEREFORE ORDERED by the Court that:
1. This Court has jurisdiction over the subject matter and the parties to the Stipulation and Agreement, including the certified plaintiff class, as enlarged and redefined in Order 1984-20.
2. The Stipulation and Agreement between the certified plaintiff class, as enlarged and redefined, and Southern Union Company and Southern Union Gathering Company is fair, reasonable and adequate, and is hereby approved pursuant to F.R. C.P. 23(e).
3. The Complaint and any Amended Complaints in Brewer, et al. v. Southern Union, et al., MDL No. 403, Colo.Civ. No. 83-F-1173, be and hereby are dismissed with prejudice as to Southern Union Company and Southern Union Gathering Company, and Judgment is to be entered releasing and forever discharging Southern Union Company and Southern Union Gathering Company, and each of them, and any of their past, present, and future divisions, affiliates and subsidiaries, including but not limited to Southern Union Exploration Company and Southern Union's division, Gas Company of New Mexico, and the successors in interest of any of them, and any officers, directors, employees, agents, attorneys, stockholders, and any other representatives, whether past, present or future and each of their respective heirs, personal representatives, successors and assigns from any and all Settled Claims, which means:
All claims and causes of action which have been, might have been or may hereafter be asserted based on the events, transactions, and factual matters alleged in said Complaints and in any Amended Complaints, claims for present and future damges and any other form of relief, whether legal or equitable, including injunctive relief, arising out of or otherwise related to the alleged fixing of prices under any agreement, combination, conspiracy, contract or any contract amendment or addendum signed or entered into prior to the date hereof for the wellhead sale of natural gas produced from the San Juan Basin.
The prosecution by any class member of any such claim shall be forever barred, irrespective of whether any individual class member claimant executes a release therefor.
4. At such time as the Class Settlement Fund as defined in previous orders of this Court is distributed to the class plaintiffs, the distribution checks shall contain appropriate wording to provide that endorsement by a class member serves as an individual release and discharge by that class member of all Southern Union Company and Southern Union Gathering Company, other entities and subsidiaries, past and present, and of their use officers, directors, employees, agents, attorneys, stockholders, and any other representatives of all actions and causes set forth in the Complaints and in any Amended Complaints, claims for present and future damages and any other form of relief, whether legal or equitable, including injunctive relief, arising out of or otherwise related to the alleged fixing of prices under any agreement, combination, conspiracy, contract or any contract amendment or addendum signed or entered into prior to the date hereof for the wellhead sale of natural gas produced from the San Juan Basin.
*1511 5. All persons and entities who are members of the certified plaintiff class, as enlarged and redefined by Order No. 1984-20 (except those identified in Exhibit 3, attached hereto as having duly requested exclusion from the certified class, as enlarged and redefined) are hereby forever barred and enjoined from instituting or prosecuting, either directly or indirectly, any and all rights, causes of action or claims which they have or hereafter may acquire arising out of or based upon or otherwise related to any of the Settled Claims as defined in Paragraph 3 of this Order against Southern Union Company and Southern Union Gathering Company and other entities and subsidiaries.
6. The Stipulation and Agreement dated April 12, 1984 is hereby approved and the parties are ordered to carry out its respective terms. The court retains such jurisdiction as may be necessary to enforce the terms of the Stipulation and Agreement.
7. The Order Governing the Production and Exchange of Confidential Information and Preserving the Attorney-Client and Work Product Privileges, entered in this case pursuant to F.R.C.P. 26(c), shall continue in full force and effect.
8. This Order terminates the litigation between the parties on the merits and leaves nothing to be done but to enforce by execution what has been determined, apart from such collateral orders as may be necessary to rule on the attorneys' fees petition and to administer the settlement fund. This court retains jurisdiction for the limited purpose of issuing such collateral orders, but such reservation shall not affect the finality of this Order which is hereby entered on the merits under Rule 41(a)(2) of the F.R.C.P.
9. This Court hereby expressly finds that there is no just reason for delay and accordingly DIRECTS the Clerk of the Court to enter Final Judgment and Dismissal with Prejudice as to the defendants Southern Union Company and Southern Union Gathering Company in the case of Brewer, et al. v. Southern Union Company, et al., MDL No. 403, Colo.Civ. No. 83-F-1175.
The above constitute our Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the F.R.C.P.

ADDENDUM TO ORDER NO. 1984-32
Attached to the original of Order No. 1984-32 are three exhibits. Exhibit # 1 is a copy of the Stipulation and Agreement signed by the parties on April 12, 1984. Exhibit # 2 is a copy of our Order No. 1984-21 which granted preliminary approval to the proposed settlement. Finally, Exhibit # 3 is a list of the names and addresses of those individuals who excluded themselves from membership in the Brewer class. Because of the volume of these exhibits, they have been attached to the original order maintained in the court file and have not been made a part of the copies provided to the parties, counsel and other interested individuals.
NOTES
[1] See Exhibit 1 to this Order. This exhibit contains (a) copy of the Stipulation and Agreement of Settlement of Claims against Southern Union Company and Southern Union Gathering Company (dated April 12, 1984); (b) Purchase and Sale Agreement between Public Service Company of New Mexico and Southern Union Company (dated April 12, 1984 and identified as Exhibit A to Stipulation and Agreement); and (c) Agreement between Plaintiffs concerning Final Settlement (dated April 12, 1984 and identified as Exhibit B to Stipulation and Agreement).
[2] See, Exhibit 2 attached to this Order.
[3] The Written Report was filed with the court on June 25, 1984.
[4] For a fuller explanation of this matter see the damage motions and supporting and opposing briefs filed by the parties between January 16, 1984 and February 9, 1984.
[5] The two cases filed in the Northern District of Texas were collectively known as the "Hecht" cases. The plaintiffs in those cases alleged violations of 15 U.S.C. § 1 and named Southern Union and others as defendants. The two cases ultimately settled.
[6] See, Chief Judge Bratton's Order dated January 26, 1982. Also See, Our Order No. 1984-3, dated January 6, 1984.
[7] See, Judge Winder's Order dated January 19, 1983. This issue was again addressed in our Order No. 1984-8, dated February 2, 1984.
[8] See, Judge Bratton's Order dated November 5, 1981, granting final approval to the Supron settlement.
[9] See, Judge Bratton's Order dated November 5, 1981, granting final approval to the Southland settlement.
[10] See, our Order No. 1984-6, dated January 11, 1984, granting final approval to the Conoco and Consolidated settlements.
[11] See, Exhibit 1 to this Order.
[12] See, Exhibit A to Exhibit 1 to this Order.
[13] See, Exhibit B to Exhibit 1 to this Order.
[14] Aspects of the Purchase and Sale Agreement are being reviewed by the Federal Trade Commission ("FTC") and the Federal Energy Regulatory Commission ("FERC"). In addition, the acquisition must be approved by the New Mexico Public Service Commission. At the Final Approval Hearing, Ms. Reuter, a staff attorney with the NMPSC, testified concerning the procedures used by the Commission to review and consider the proposed acquisition. At this point in time the acquisition is undergoing public comment and briefing. A certain amount of discovery is also permitted on the part of intervenors seeking more information on the transaction. Ms. Reuter stated that no decision by the Commission was likely before October of 1984.
[15] See, Fn. 3, supra.
[16] See, Exhibits 7-14 admitted into evidence at the Final Approval Hearing.
[17] Mr. Donkin testified that he had been involved in three other antitrust cases involving overcharges stemming from alleged price fixing. Mr. Donkin stated that each case settled. In none of the three did plaintiffs obtain more than 20-30% of their alleged single damages.
[18] The remaining two class representatives are Ms. Vodene Patterson and Mr. Jay Miller.
[19] See, Exhibits 17 and 25 admitted into evidence at the Final Approval Hearing. Specifically Appendix VI of each exhibit contains copies of objections filed or submitted.
[20] We read the BMI decision to hold that in two situations the courts should refrain from applying the per se rules of antitrust liability in price fixing cases. The first situation involves an agreement which actually creates a new and unique product rather than simply establishing a uniform price for competing goods.

In BMI, the court also stated that judicial inexperience with a particular challenged arrangement should counsel against extending the reach of the per se rule of liability. It is this second proposition which we believe may have application in the instant litigation. In this case, the plaintiffs do not allege "traditional" horizontal price and output restrictions. In addition, the challenged conduct has occurred within a market that does not appear to be wholly competitive even absent the challenged agreements.
Based on the above, it might be possible to argue against the application of the per se rule to the facts of this case depending on their development at trial. See, NCAA, supra, at ___, 104 S.Ct. at 2960 (fn. 21).
[21] Several settlement conferences took place in the U.S. Courthouse in Denver; these were scheduled by the Court in the fall of 1983.
[22] See, paragraphs 3 and 4 to Exhibit B to Exhibit 1 to this order, which describes the Brewer class involvement in future renegotiations of natural gas purchase contracts.
[23] While this settlement may not eliminate all aspects of the alleged illegal conduct, a court may deny approval only where the proposed settlement initiates or authorizes continuation of clearly illegal conduct. The illegality must appear as a legal certainty on the face of the agreement, See, Gautreaux v. Pierce, 690 F.2d 616, 637 (7th Cir.1982); Bennett v. Behring Corp., 96 F.R.D. 343 (D.C.Fla.1982).